[No. A068090. First Dist., Div. Four. Dec. 15, 1995.]

TICOR TITLE INSURANCE COMPANY et al., Plaintiffs and
Respondents, v.
EMPLOYERS INSURANCE OF WAUSAU, Defendant and Appellant.

**COUNSEL**

Zelle & Larson, Steve D. Meier and Patricia St. Peter for Defendant and Appellant.

Pillsbury, Madison & Sutro, Walter R. Allan, Stephen Stublarec, John M. Grenfell, Warren H. Nelson, Jr., and Roger E. Booth for Plaintiffs and Respondents.

**OPINION**

**ANDERSON, P. J.—**

## I. INTRODUCTION AND BACKGROUND

This appeal involves yet another insurance squabble in the tangle of litigation stemming from the demise of Technical Equities Corporation (TEC), a diversified investment services company that sought bankruptcy court protection in February 1986. Appellant is Employers Insurance of Wausau (Wausau), provider of second layer excess general liability insurance to respondent Ticor Title Insurance Company and Ticor Title Insurance Company of California (Ticor).

The bankruptcy estate of TEC (Estate) sued Ticor for its alleged acts or omissions in preparing and recording title documents which obscured the illusory underpinnings of a TEC real estate option program and thereby aided TEC directors and officers in their scheme to loot and defraud the

company. Certain investors in TEC also asserted claims against Ticor arising out of the same conduct.

Ticor tendered defense of the Estate's claims to Wausau in December 1990, appending the Estate's petition to "add on" Ticor as a defendant in its existing, coordinated actions. The next month Wausau denied coverage for Ticor's claims and the Estate filed its first amended complaint formally targeting Ticor as a defendant.

In September 1991 Ticor settled the Estate and investor claims for $7.5 million. Two months later Ticor turned around and sued the various insurers in the ladder of its primary and excess liability insurance program.[1] Ticor sought declaratory relief as well as damages for breach of contract and breach of the implied covenant of good faith and fair dealing. CNA and National Union settled with Ticor. Ticor's case against Wausau proceeded to trial and judgment, with a $4,192,339[2] verdict against Wausau, plus an additional $1,870,00 in attorney fees and litigation expenses pursuant to *Brandt* v. *Superior Court* (1985) 37 Cal.3d 813 [210 Cal.Rptr. 211, 693 P.2d 796].

Wausau challenges the multimillion dollar judgment on all fronts. First, it urges that Ticor had no right, under the "bodily injury" clause of the policy, to indemnification for settlement of the investor claims because in the last analysis the investors' injuries flowed from financial losses, for which the policy afforded no coverage. Second, Wausau maintains it had no duty to defend the Estate's claims because (1) given that it was an excess carrier, its duty to defend did not kick in until the underlying CNA coverage was exhausted and (2) in any event there was no potential for coverage under the Wausau policy. We agree on all points and reverse the judgment in its entirety.

---

[1] Transportation Insurance Company, a CNA company, provided general liability insurance for the period April 1, 1985, to April 1, 1986; Continental Casualty Company, another CNA entity, provided the first layer of excess coverage for the same period. (Collectively, we refer to these companies as CNA.) Wausau provided the second layer of excess coverage under an umbrella policy with liability limits up to $5 million in excess of the $1 million combined policy limits of the CNA policies. National Union Fire Insurance Company (National Union) was the third layer carrier.

[2] Of that verdict, the jury awarded $2,192,339 as reasonable defense costs incurred by Ticor in defending the Estate's lawsuit and $2 million to indemnify Ticor for its settlement of the investor claims upon a finding that there was "an occurrence resulting in bodily injury" to the investor claimants. Although the jury found that Wasau acted "unreasonably or in bad faith in connection with Ticor's claim," it did not further find that the insurer acted with malice, oppression, or fraud. Finally, the jury declined to find that "there was an occurrence [under the Wausau policy] resulting in property damage to the Estate" and returned a verdict of zero on that claim.

## II. Discussion

### A. *There Was No Coverage for Investor Claims Under the Bodily Injury Clause*

The investors never filed suit against Ticor. However, Alan Ruby, attorney for the investors, appeared at the settlement conference between Ticor and the Estate and inserted the investor claims into the settlement negotiations. Ruby indicated that his clients intended to sue Ticor for economic damages in excess of $100 million as well as emotional distress damages. Ticor quickly settled these claims for $2.2 million.

At the trial against Wausau, Ruby explained the basis for seeking emotional distress damages: "The consequences of the collapse of Technical Equities took a financial toll on all of our clients. [¶] There was also a very heavy emotional toll taken on our clients. . . . [¶] Many of our clients were elderly people. Many of them were people who had lost money that was for their retirement and for their support in retirement or otherwise. [¶] And when that money suddenly vanished the emotional consequences were awful." And further: "They suffered [emotional distress] from losing their life savings."

■ By requested (but denied) jury instruction as well as motions for nonsuit and directed verdict, Wausau argued that under authority of *McLaughlin* v. *National Union Fire Ins. Co.* (1994) 23 Cal.App.4th 1132 [29 Cal.Rptr.2d 559] and *Chatton* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 846 [13 Cal.Rptr.2d 318], both decided under the coordinated TEC litigation proceedings,[3] there was no coverage under its "bodily injury" provisions for the investor claims because any "bodily injury" sustained by the investors resulted directly from their investment losses. The trial court disagreed and the cause was submitted to the jury with interrogatories querying (1) whether there was an occurrence resulting in bodily injury to the investor claimants and, if so (2) what amount, if any, of the settlement paid to the investors should be paid by Wausau.

The trial court erred. In *Chatton* we had occasion to examine whether National Union's CGL policy afforded coverage for emotional distress suffered by TEC investors when that distress arose from their investment losses caused by negligent misrepresentations of TEC officers and directors.

---

[3]Both cases addressed coverage and defense issues pertaining to the comprehensive general liability (CGL) policy which National Union issued to TEC during the time frame of the TEC financial collapse.

Under that policy, coverage was forthcoming for "bodily injury" or "property damage" caused by an "occurrence."[4]

We first held that the phrase "bodily injury, sickness, or disease" is plain and unambiguous, limiting coverage to physical injury to the body and excluding nonphysical, emotional, or mental harm. (*Chatton* v. *National Union Fire Ins. Co., supra*, 10 Cal.App.4th at pp. 853-856.) Next, we explained that the investment loss suffered by the investors, upon which their emotional trauma was predicated, constituted an injury to *intangible* property and, hence, by definition such loss was not recoverable under the policy. (*Id.*, at pp. 857-859.) Finally, we concluded that the negligent misrepresentations of the insured officers and directors were not "occurrences" within the meaning of the policy. We clarified that negligent misrepresentations, however, causing loss of economic interest, are purposeful rather than accidental acts for purposes of CGL coverage because they require an intent to reduce reliance and, thus, are relatives of fraud. (*Id.*, at p. 861.)

*McLaughlin* took the above analysis a step further in light of the investors' contention that they suffered emotional *and physical* distress which in turn derived from investment loss negligently inflicted upon them by the insureds. Reiterating that damage for loss of investment is not cognizable under the property damage clause of the CGL policy, we further held: "[S]ince Plaintiffs' physical distress was induced by an uncovered economic loss it defies reason that bodily injury coverage would nevertheless independently obtain. 'It would expand coverage of [CGL] policies far beyond any reasonable expectation of the parties to sweep within their potential coverage any alleged emotional or physical distress that might result from economic loss that is itself clearly outside the scope of the policy. [Citation.]' (*Keating* v. *National Union Fire Ins.* (9th Cir. 1993) 995 F.2d 154, 156-157.)" (*McLaughlin* v. *National Union Fire Ins. Co., supra*, 23 Cal.App.4th at p. 1150.)

Very recently our Supreme Court followed suit and agreed that parties to a CGL policy could not reasonably expect that coverage would be expanded simply because a claim of emotional or physical distress is alleged as a result of an uncovered economic loss. (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 23 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

---

[4]The policy defined bodily injury as " 'sickness or disease sustained by any person which occurs during the policy period.' " (*Chatton* v. *National Union Fire Ins. Co., supra*, 10 Cal.App.4th at p. 852.) "Property damage" under the policy referred to physical injury to, or destruction or loss of use of, tangible property. Finally, the term "occurrence" was defined as " 'an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.' " (*Ibid.*)

*McLaughlin* controls here. For all practical purposes, save one, the relevant Wausau policy provisions are virtually the same as their National Union counterparts. The one difference is the Wausau definition of "bodily injury" which includes physical injury, etc., as well as "mental or emotional injury, sickness, disease, disability, anguish, or shock. . . ." This difference does not in fact make any difference.

Ticor argues that the Wausau "bodily injury" coverage is independent of its "property damage" coverage and there is no basis for reading the limitations of the latter into the former, pointing to expert testimony of former California Insurance Commissioner Richard Roddis. Roddis testified that coverage under a CGL depends on "the nature of the damage, property damage versus some other sort of damage. . . ." No one would argue with that statement. Then, in response to a question whether one could recover economic loss under the policy, he used the illustration of an automobile accident to explain that if an injured pedestrian becomes permanently disabled from the accident, the policy would cover economic loss in the nature of lost career earnings *because it results from the bodily injury.*

This illustration is the flip side of our situation. Under the former Insurance Commissioner's example, you start with a primary injury that is covered under the policy—bodily injury from an accident. Economic loss stemming from that injury is covered. But, if you start with an uncovered economic loss in the form of dissipated investments, *McLaughlin* and *Keating* teach that you cannot then tag on *emotional or physical distress* induced by that uncovered loss. Thus, even though a CGL policy such as Wausau's provides coverage for emotional harm caused by an occurrence, if that harm is the by-product of an uncovered financial loss there is no coverage, period.

As a matter of law there is no basis to support Ticor's claim for indemnification of the settlement paid to the investors and, therefore, we reverse the judgment awarding $2 million on that claim.

### B. *Wausau Had No Duty to Defend the Estate's Claims*

After hearing all the evidence the court ruled that Wausau "had and breached" a duty to defend the Estate claims brought against Ticor, and so instructed the jury that "this is a legal ruling and is binding on you." Wausau objected and comes now to attack the propriety of that instruction. The instruction should never have been delivered because Wausau had no duty to defend.

#### (1) *Wausau's Duty Was Not Triggered Because CNA Refused to Defend*

The insuring agreement of the Wausau policy states in part: "With respect to any claim or suit seeking damages by reason of an occurrence to which

this policy applies or would apply except for the amount of the *retained limit, and for which no defense coverage is provided by underlying insurance* . . . , the company will defend any such suit against the insured alleging such damages and seeking recovery on account thereof. . . . [¶] The company will pay, in addition to the applicable limit of liability, the following *defense expenses*: . . . ."[5] (Italics in original, italics added.)

Wausau first asserts that if there was any duty to defend the Estate's lawsuit, that obligation resided with CNA, Ticor's primary and underlying insurer. In this case, CNA refused to provide a defense and, thus, Ticor settled the Estate lawsuit without any resources forthcoming from its primary insurer. It was not until Ticor sued all of its insurers that CNA settled, allocating a portion of the settlement to defense costs incurred in the underlying action. Under these circumstances, Wausau maintains its duty to defend never came into play. We agree.

As a general rule, under California law the primary insurer alone owes a duty to defend, with the corresponding right to control the defense. In the absence of contract language to the contrary, the excess carrier has no right or duty to participate in the defense until the primary policy limits are exhausted. (*Signal Companies, Inc.* v. *Harbor Ins. co.* (1980) 27 Cal.3d 359, 365, 370-371 [165 Cal.Rptr. 799, 612 P.2d 889]; *Diamond Heights Homeowners Assn.* v. *National American Ins. Co.* (1991) 227 Cal.App.3d 563, 577 [277 Cal.Rptr. 906].) In any given case, of course, we look to the specific language of the excess policy to ascertain the existence of a duty to defend, and whether the excess insurer must "drop down" to assume the obligations of a primary insurer under circumstances of insolvency or refusal to defend.

Our rules governing interpretation of contracts, including insurance policies, teach us that the overriding goal of interpretation is to give effect to the parties' mutual intentions as of the time of contracting. (Civ. Code,[6] § 1636.) Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further. (§§ 1638, 1639; *Helfand* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 879 [13 Cal.Rptr.2d 295].) We understand the words of a contract according to their ordinary and popular meaning unless the parties use them in a technical sense or "a special meaning is given to them by

[5]The policy defines "defense expenses" as "all reasonable expenses (other than the amount of any judgment or settlement) incurred by the *insured* or the company as provided in Insuring Agreement II of this policy with respect to the investigation, defense or settlement of claims or suits, except . . . . (b) *any such expenses payable under underlying insurance* . . . ." (Italics in original, italics added.)

[6]All further statutory references are to the Civil Code.

usage. . . ." (§ 1644.) However, where the terms of a promise are ambiguous or uncertain we interpret the promise "in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (§ 1649.) "This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' " (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) If use of this rule does not eliminate the uncertainty, we construe the applicable language against the insurer, the drafter who created the uncertainty. (*Ibid.*; § 1654.)

California case law has consistently protected the limited and shielded position of the excess carrier when the obligations of the excess carrier are set in clear phrases. For example, Division Three of this court recently concluded that language incorporated into the excess policy stating that the underlying policy "must be exhausted solely by payment of losses" was clear and unambiguous and precluded an obligation of the excess carrier to "drop down" to provide coverage upon the insolvency of the primary insurer. (*Wells Fargo Bank* v. *California Ins. Guarantee Assn.* (1995) 38 Cal.App.4th 936, 939, 944-946 [45 Cal.Rptr.2d 537].)

We have uncovered no California cases dealing with the issue of whether the excess insurer has a duty to defend when the primary insurer refuses and the amount of the claim approaches or exceeds the primary limits. At least one California treatise has commented on this situation, pointing out that although the matter "has not yet been clearly decided" in this state, "it appears likely that no such duty exists until those limits have been exhausted." (2 Cal. Liability Insurance Practice (Cont.Ed.Bar 1995) § 17.27, pp. 17-24.)[7]

■■■ We see no reason not to treat refusal to defend cases like insolvency "drop down cases" and, thus, we proceed by examining the insuring

---

[7]Ticor points to two general treatises which state that the excess carrier *does* have a duty to defend if the primary insurer denies coverage and a defense, but these treatises cite only out-of-state law to support their proposition. (See 7C Appelman, Insurance Law and Practices (rev. ed. 1979) § 4682, p. 33; *id.* (1995 pocket supp.) § 4682, p. 8; 14 Couch on Insurance (rev. 2d ed. 1982) § 51:36, pp. 446-447.)

For example, in *Hocker* v. *New Hampshire Ins. Co.* (10th Cir. 1991) 922 F.2d 1476, the circuit court held that under Wyoming law and the terms of the excess policy, the excess insurer's defense obligations were activated even though the primary insurer wrongfully refused to defend. The excess policy language concerning occurrences "not covered, as warranted" by the underlying policy spoke to the possibility that the primary insurer would wrongfully deny coverage for an occurrence that it had warranted would be covered; in that case, the excess insurer would have to "drop down" and provide a defense. (*Id.*, at pp. 1481-1482.)

language to ascertain if it clearly and unambiguously precludes dropping down in this situation. We conclude it does.

Under the Wausau policy, the duty to defend arises when there is a claim for damages for an occurrence under the policy *and* "no defense coverage is provided by underlying insurance." Ticor claims the defense clause is "at best" ambiguous and must be interpreted to mean that because CNA did not "act" to defend Ticor in the underlying action, there was no underlying defense coverage. Not so.

Webster's Ninth Collegiate Dictionary (1984) (Webster's) defines "coverage" this way: "1 : the act or fact of covering 2 : something that covers: as a : inclusion within the scope of an insurance policy or protective plan : INSURANCE." (*Id.*, at p. 300.)

Ticor quotes the first, but not the second definition. Obviously, when the contract in question is an insurance policy and the term in question is "defense coverage" we have a more "special meaning" pertaining to insurance usage, and that "special meaning" must be followed. (§ 1644.) In the context of an insurance policy, coverage means "inclusion within the scope of an insurance policy," not "the act or fact of covering." Thus "coverage" has nothing to do with how, in reality, the insurer acts with respect to its insurance obligations. (See *Wells Fargo Bank* v. *California Ins. Guarantee Assn.*, *supra*, 38 Cal.App.4th at pp. 948-949 [applying similar reasoning to the terms "covered" and "not covered" in an excess policy].) Moreover, Wausau's commitment to provide a defense was a commitment to pay "defense expenses," defined to *exclude* any defense-related expenses "payable under underlying insurance." Again, "payable" means "that may, can, or must be paid." (Webster's, *supra*, at p. 864.) Thus, so long as defense obligations are "payable" (not actually paid) by CNA—there is no duty to defend under the Wausau policy.

We therefore agree with Wausau that if there was a duty to defend at all, that duty was CNA's until its limits of liability were spent. For purposes of the Estate's claims, the substantive coverage afforded by the CNA policy and the Wausau policy was identical and, thus, because CNA never came forward, Wausau's obligation was never triggered.

Ticor counters that Wausau's conduct in handling Ticor's claim was "inconsistent" with the interpretation of the defense clause it now advances. It urges that because Wausau did not inquire into the particular terms of the CNA policies, and because Wausau's response to Ticor's tender raised other coverage issues, the insurer cannot now rely on its defense clause and

position as excess carrier to defeat the duty to defend. First, what is clear is that Wausau has consistently denied that it had a duty to defend the Estate claims. What it did or did not know about the particulars of the CNA policies is irrelevant. Either CNA had a duty to defend or it did not, and nothing Wausau said or did would change that fact. Moreover, our Supreme Court has just pronounced that an insurer's denial of coverage on one ground does not, absent clear and convincing evidence suggesting otherwise, impliedly waive grounds not stated in the denial. (*Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 31.)

### (2) *There Was No Duty to Defend Under the Property Damage Clause*

■ Finally, Wausau argues that, even if we were to ignore its status as excess carrier and treat it like a primary provider, there was no duty to defend Ticor against the Estate's claims because there was no potential for coverage under the policy. Ticor contends to the contrary that the Estate's complaint raised the potential for coverage under Wausau's "property damage" clause, which includes coverage for loss of use of tangible personal property caused by an occurrence.[8] Ticor points to various allegations in the complaint to the effect that Ticor, acting either intentionally or negligently, helped the officers and directors of TEC loot and defraud the company of its assets by converting, misappropriating and diverting corporate assets. Corporate assets included funds and cash as well as real property and subsidiary manufacturing companies that produced rubber and metal products.

The defense obligation "is established at the outset of the litigation and is fixed by facts which the insurer garners from the complaint and other sources which give rise to a potential of liability under the policy. [Citations.] However, while the duty to defend is broad, where there is no potential for recovery, there is no duty to defend." (*McLaughlin* v. *National Union Fire Ins. Co.*, *supra*, 23 Cal.App.4th at pp. 1148-1149.)

We agree with Wausau that there was no potential for recovery under the property damage provisions and, thus, it properly turned down Ticor's tender.

Turning to the complaint, we first note that the numerous allegations of Ticor's intentional misconduct would not fall within the scope of coverage because the acts in question would not qualify as an "occurrence." The one

---

[8]The Wausau policy defines "property damage" as "(1) physical injury to or destruction of tangible property which occurs during the policy period including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed. . . ."

negligence cause of action alleges that Ticor breached its duty of care to TEC "by not reasonably and prudently performing trustee, escrow, title and agency services, *and particularly by failing to inform TEC's attorneys or auditors about the existence of the deeds of reconveyance or about the unusual and suspicious nature of the facts of the transaction, as Ticor knew them.* Ticor failed to act reasonably as trustee, and escrow agent, failed to exercise ordinary care in the performance of its duties and responsibilities, and failed to discharge those duties and responsibilities in accordance with the standards of the industry." (Italics added.)

These general allegations of negligence are not dispositive of whether the complaint potentially alleged an occurrence. The complaint contains a section entitled "ACTS AND OMISSIONS OF TICOR" which is incorporated into each cause of action against Ticor, including the negligence cause, and which recites in detail the specific conduct of Ticor which enabled the TEC officers and directors to cover up a fraudulent real estate option program. In particular, Ticor was trustee under three second deeds of trust in favor of TEC that were collateral to secure an obligation on the part of outside entities to refund $25.8 million to TEC in the event certain real estate options were not exercised. Ticor also executed and notarized three deeds of reconveyance covering the same property, recorded one, and arranged for a cooperating title company to record the other two. The reconveyances were recorded within one to six days following the recording of the deeds of trust. The underlying deeds of trust were of substantial interest to TEC's auditors and lawyers and the reconveyances, following practically on their heels, rendered them illusory as collateral security for the option program. Ticor also prepared abstracts of title with respect to the three pieces of property that showed title "as of" more than a month earlier, such that the reconveyances were not depicted. Ticor did not disclose these unusual title circumstances to the TEC auditors and attorneys. Ultimately, in January 1986, the TEC board of directors learned of the illusory nature of the option program and fired its president, Harry Stern. The complaint alleged that, had Ticor in June or August of 1985 promptly disclosed what it knew, Stern would have been fired in June, July or August and the "millions of dollars that the Stern Group diverted and looted in the interim, as well as other millions of dollars that the Stern Group caused TEC to waste and misspend in the interim" would have been saved.

The crux of these allegations is that Ticor had, and breached, a duty to promptly disclose material information to TEC's attorneys and auditors—namely, the existence and timing of the reconveyances and the unusual state of title depicted in the abstract. This breach in turn deferred the firing of

Stern by five to seven months, which enabled millions of dollars to be looted, wasted and misspent in the interim. These are not allegations of an accidental event resulting in loss of use of tangible property.

The problem was not, as Ticor attempts to claim, that it somehow performed sloppy title or escrow work. The problem, clearly set out in the complaint, is that the insureds did not tell TEC's auditors and attorneys what they knew about the unusual and suspicious events surrounding the properties in question, or the current status of title thereto. Undressed, the allegations against Ticor state an imperative of disclosure which could only exist when the insureds had knowledge that others—i.e., the TEC auditors and attorneys and ultimately the TEC board of directors—were relying on the incomplete state of facts that they put forth. The ingredients of knowledge and reliance cast Ticor's actions and inactions in a nonaccidental mode. (See *Dykstra* v. *Foremost Ins. Co.* (1993) 14 Cal.App.4th 361, 368 [17 Cal.Rptr.2d 543]; *Chatton* v. *National Union Fire Ins. Co., supra,* 10 Cal.App.4th at pp. 861-862; *McLaughlin* v. *National Union Fire Ins. Co., supra,* 23 Cal.App.4th at p. 1149.) The complaint did not allege an occurrence giving rise to a duty to defend.

Even if, by some leap of imagination, we were to agree that professional negligence in performing trustee, escrow and title services was the conduct that harmed the Estate, and that such conduct amounted to an "occurrence" under the Wausau policy, we still would proclaim there was no coverage and no duty to defend because the losses alleged by the Estate were not covered losses. To reiterate, Ticor's alleged misdeeds purportedly deferred the firing of Stern, thereby contributing to the economic collapse and eventual bankruptcy of TEC because in the interim, Stern and his cohorts diverted, looted, wasted and misspent millions of dollars.

The focus of coverage for property damage, including loss of use of tangible property, is the property itself. What the insurer agrees to pay on the insured's behalf, subject to liability limits, etc., is the amount of damages which the insured becomes obligated to pay because of damage to, or loss of use of, tangible property. Ticor contends it was entitled to a defense because the complaint alleged diversion and misappropriation of corporate assets which conceivably could have caused loss of use of some tangible corporate property. However, nothing in the complaint remotely suggests that the Estate was seeking damages for loss of use of tangible corporate property. The loss which the Estate suffered at Ticor's hands was an economic loss—the plummet in TEC's value in the pernicious hands of Stern and company. As the complaint alleged, on June 28, 1985, the independent certified public accountant for TEC issued an unqualified opinion regarding

TEC's financial statements. Less than eight months later the corporation announced that these financial statements should not be relied on—the bubble was burst in the "illusion of prosperity manufactured by the Stern group." Such a loss falls outside the scope of CGL property damage coverage. (*Chatton* v. *National Union Fire Ins. Co., supra,* 10 Cal.App.4th at pp. 857-858; *McLaughlin* v. *National Union Fire Ins. Co., supra,* 23 Cal.App.4th at p. 1150; *Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 17-18.)

(3) *There Was No Duty to Defend Under the "Advertising Injury" Clause*

 Finally, we note that the Estate also lodged allegations of unfair competition against Ticor. The Wausau policy provided coverage for "advertising injury" which included injury resulting from "unfair competition" on the part of the insured. Our Supreme Court has ruled that the term "unfair competition" in the standard CGL advertising injury clause or endorsement does not embrace conduct prohibited by unfair business practice statutes. Rather, it refers only to the common law tort of unfair competition, which requires a showing of competitive injury. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at pp. 1263-1264.) The Estate's complaint does not hint of a claim of competitive injury; indeed Ticor has never contended that TEC and Ticor were competitors. ██ Thus, the Wausau advertising injury provisions could not sustain the court's instruction that Wausau had, and breached, a duty to defend.[9]

C. *The Judgment on the Breach of Covenant Cause Must Be Reversed*

The jury found that Wausau acted unreasonably or in bad faith in denying Ticor a defense but it did not find by clear and convincing evidence that Wausau had acted with malice, oppression or fraud. We have concluded there was no coverage under the Wausau policy for the Estate's claims and, thus, Wausau had no duty to defend Ticor against that lawsuit. The court's erroneous instruction to the contrary that Wausau had and breached that duty for all practical purposes sealed a bad faith finding. The judgment on that

---

[9]That the Supreme Court had not rendered its decision in *Bank of the West* at the time Wausau denied Ticor a defense is irrelevant. Case law applies retroactively to all cases still open on direct review and to all events, regardless of whether such events predate or postdate announcement of the rule. (*Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 24.) Therefore, if the policy terms provide no potential for coverage, the insurer acts properly in denying a defense even if that duty is later evaluated under an appellate decision that did not exist at the time of the tender. (*Id.,* at p. 26.) Moreover, since the duty to defend depends on whether there is potential liability based on facts pled in the complaint or known to the insurer, there is no duty where the only potential for liability turns on resolution of a legal question. (*McLaughlin* v. *National Union Fire Ins. Co., supra,* 23 Cal.App.4th at p. 1151.)

finding, including the judgment for $1,870,000 in *Brandt*[10] fees, must be reversed. There being no duty, as a matter of law there could be no breach of the covenant for failure to defend or any ancillary duty such as the duty to investigate. (See *McLaughlin* v. *National Union Fire Ins. Co.*, *supra*, 23 Cal.App.4th at pp. 1159-1162.)

## III. DISPOSITION

We reverse the judgment in its entirety and direct entry of judgment in favor of Wausau on all causes. Ticor to pay costs on appeal.

Reardon, J., and Hanlon, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 11, 1996. George, J., was of the opinion that the petition should be granted.

---

[10]Under *Brandt* v. *Superior Court*, *supra*, 37 Cal.3d 813, 817, the insured can recover—as an element of damages stemming from the insurer's tortious breach of the covenant of good faith and fair dealing—attorney fees reasonably incurred to compel payment of policy benefits. Backed by the finding that Wausau breached the implied covenant, Ticor moved for, and received, *Brandt* damages in the amount of $1,870,000.