Filed 7/28/23  Stevens v. The Regents of the University of Cal. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DON STEVENS et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,<br><br>    Defendants and Respondents,<br><br>CAPSTONE DEVELOPMENT PARTNERS LLC et al.,<br><br>    Real Parties in Interest. | H050230<br>(Santa Cruz County<br> Super. Ct. No. 19CV03696) |

Appellants Don Stevens, Russell B. Weisz, Hal Levin, Harry D. Huskey, and Peter L. Scott sued the Regents of the University of California (the Regents) and the University of California, Santa Cruz (UCSC), asserting that the Regents and UCSC violated the Comprehensive Settlement Agreement (Settlement Agreement) that had previously resolved a lawsuit over UCSC's 2005 Long Range Development Plan (2005 Plan).[1]

Appellants challenge the Regents' approval in 2019 of the Student Housing West project (housing project) and Amendment No. 2 to the 2005 Plan, which changed the land

_____
[1] There were additional signatories to the Settlement Agreement who are not parties to this lawsuit.

use designation of 17 acres on the "Hagar site" at the southern tip of the East Meadow at UCSC from "Campus Resource Land"[2] to "Colleges and Student Housing." Appellants contend section 5.1 of the Settlement Agreement required a comprehensive analysis of potentially feasible alternative off-campus locations when there is a "major amendment" to the 2005 Plan and that respondents breached the Settlement Agreement by approving Amendment No. 2 without first preparing such an analysis.

Following a hearing on the issue of "[w]hether Amendment No. 2 . . . to the University's 2005 [Plan] violates Section 5.1 of the [Settlement Agreement]," the trial court ruled in favor of respondents. The court interpreted section 5.1 as requiring analysis of off-campus alternatives only when there is a "major amendment" that is made to respond to or support proposed enrollment growth beyond that analyzed in the 2005 Plan's environmental impact report (EIR). It also found that appellants improperly conflated the number of beds to be added under the housing project with the number of students to be enrolled, and that Amendment No. 2 therefore did not propose enrollment growth beyond that analyzed in the 2005 Plan EIR.

Because we interpret "major amendment" as used in the Settlement Agreement as the trial court did, we discern no duty under the contract to analyze off-campus alternatives. We therefore affirm the judgment.

## I.     BACKGROUND

### A.     *Factual History*

Each University of California campus is required to "periodically develop[] a Long Range Development Plan that guides its physical development, including land use designations, the location of buildings, and infrastructure systems, for an established time horizon." (Ed. Code, § 67504, subd. (a)(1); see also Pub. Res. Code, § 21080.09.)

---

[2] "Campus Resource Land" is a designation "assigned to lands not planned for development during the 2005 [Plan] timeframe but also reserved for future use by the campus."

2

Preparation of an EIR is required in connection with a Long Range Development Plan. (Pub. Res. Code, § 21080.09, subd. (b); see also *Make UC A Good Neighbor v. Regents of University of California* (2023) 88 Cal.App.5th 656, 667 ["An EIR . . . is . . . required whenever a public agency proposes to undertake or approve a project that may have a significant effect on the environment."]; see also *Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 231 [a Long Range Development Plan "must be analyzed in an environmental impact report (EIR) under CEQA"].)  Long Range Development Plans and draft EIRs are submitted for public review, at which time summaries of the documents are also provided to the Legislature. (Ed. Code, § 67504, subd. (a)(2).)  The Legislature has instructed that, "[c]onsistent with the requirements of the California Environmental Quality Act (CEQA), it is the intent of the Legislature that the University of California sufficiently mitigate significant off-campus impacts related to campus growth and development."  (Ed. Code, § 67504, subd. (b)(1).)

On September 21, 2006, the Regents approved the 2005 Plan.  It provided a comprehensive framework for the physical development of UCSC to accommodate an on-campus three-quarter average enrollment of 19,500 full time equivalent (FTE) students by 2020-21.  The 2005 Plan identified targets for on-campus housing for 50 percent of undergraduate students and 25 percent of graduate students.

On October 23, 2006, appellants and several others filed petitions for writ of mandate challenging the 2005 Plan and its associated EIR.  The trial court granted in part and denied in part the petitions and, as a result, the parties ultimately entered into the Settlement Agreement on August 15, 2008.  The trial court incorporated the Settlement Agreement into its judgment, "retain[ing] jurisdiction during the duration of the Settlement Agreement, as provided in the [Settlement] Agreement, for purposes of resolving disputes that may arise in connection with the interpretation or implementation of the Settlement Agreement."

The first section of the Settlement Agreement concerns enrollment. It provides that the FTE three-quarter average for undergraduates "will not exceed 17,500." It projects combined graduate and undergraduate enrollment levels for several years, culminating in a combined enrollment of "19,480 in academic year 2020-2021." The Settlement Agreement also addresses housing, stating that UCSC will provide housing capacity of 7,125 beds for enrollment up to 15,000 students and additional beds "to accommodate 67% of enrollment above 15,000, which equates to 3,000 new beds above the 7,125 beds if enrollment reaches 19,500." The Settlement Agreement states that "UCSC housing may be accommodated on or off campus" but that "UCSC will limit the number of new off-campus beds created in the City of Santa Cruz after the effective date of this Agreement to no more than 225 beds . . . ."

Relevant to this appeal, section 5.1 of the Settlement Agreement states: "In recognition of the purpose and intent of Measures I and J, as adopted in November 2006, UCSC agrees that the next major amendment to the 2005 [Plan] will include a comprehensive analysis of potentially feasible alternative locations to accommodate proposed UCSC enrollment growth beyond that analyzed in the 2005 [Plan] EIR (i.e., satellite campuses, remote-classrooms, etc.) as a means of assessing UCSC's ability to meet the State Mandate for Higher Education while taking into consideration City of Santa Cruz infrastructure including, but not limited to, transportation, water and housing."

In 2014, UCSC proposed the housing project here at issue to add approximately 3,072 student beds at two sites – the Heller site and the Hagar site – on the UCSC campus. The housing project required an amendment (proposed Amendment No. 2) to the 2005 Plan, which would change the land use designation of 17 acres on the Hagar site at the southern tip of the East Meadow at UCSC from "Campus Resource Land" to "Colleges and Student Housing."

4

In 2018, UCSC issued a draft and revised draft project EIR. The project EIR was "tiered" from the program EIR for the 2005 Plan: for the "narrower" housing project, it "us[ed] the analysis of general matters contained in [the 2005 program EIR,] incorporating by reference the general discussions from the broader EIR . . . concentrating . . . solely on the issues specific to the later project." (See Cal. Code Regs., tit. 14 (CEQA Guidelines), § 15152; see also Pub. Res. Code, § 21080.09.)[3]

The Regents approved the housing project on March 14, 2019. As part of the approval, the Regents also approved Amendment No. 2 to the 2005 Plan and certified the final project EIR.

On September 30, 2021, the Regents approved a 2021 Long Range Development Plan (2021 Plan) for UCSC and certified the final program EIR for that 2021 Plan.

**B.** *Procedural History*

On December 12, 2019, appellants filed this action challenging the approval of the housing project on the ground that it violated the Settlement Agreement. In the original

---

[3] The superior court in October 2020 granted an earlier petition for writ of mandate in a CEQA action challenging the Regents' approval of the housing project, as well as the tiering of the EIR for the housing project "to the extent . . . that the Regents' findings regarding the infeasibility of the [housing] project alternatives did not comply with CEQA, [but] denied the petition as to all other claims of CEQA violations. The court ordered that a peremptory writ of mandate issue directing the Regents to correct the CEQA error regarding the infeasibility of the project alternatives, and staying all [housing] project activities until the error is corrected." Petitioners East Meadow Action Committee appealed, contending that "the trial court erred in ordering a limited peremptory writ of mandate that did not direct respondents to set aside their approval of the [2005 Plan] amendment designating the East Meadow for development and their certification of the EIR." A different panel of this court affirmed the trial court's judgment in *East Meadow Action Committee v. Regents of the University of California* (Feb. 4, 2022, H048695) [nonpub. opn.] (*East Meadow*).

On March 18, 2021, in compliance with the trial court's judgment, the Regents set aside the adoption of the housing project and its related project EIR. At the same meeting, the Regents again approved the housing project and related CEQA findings. Appellants here were not parties to the 2020 CEQA action.

5

complaint, appellants set forth causes of action for declaratory relief and breach of contract. Appellants filed a first amended complaint on March 3, 2020, and a second amended complaint on July 9, 2020, following a demurrer by respondents. Respondents again demurred and also moved to strike portions of the second amended complaint. The trial court overruled the demurrer but granted the motion to strike in part.

Respondents again challenged the second amended complaint in 2021, filing a motion for judgment on the pleadings and motion to strike. In its October 1, 2021, order on the motions, the trial court denied the motion for judgment on the pleadings, but granted the motion to strike in part, striking appellants' claims challenging the 2019 approvals of the housing project and appellants' repudiation claim based on the 2020 Long Range Development Plan.[4]

Appellants filed the operative third amended complaint, which set forth causes of action for declaratory relief, breach of contract, and "writ of mandate" on September 17, 2021. In the third amended complaint, appellants alleged that respondents had failed to comply with the requirement in section 5.1 of the Settlement Agreement to conduct a comprehensive analysis of potentially feasible alternative locations to accommodate proposed UCSC enrollment growth beyond that analyzed in the 2005 Plan before approving any major amendment to the 2005 Plan. Appellants alleged that Amendment No. 2 was such a "major amendment."

The parties stipulated that appellants' "sole remaining claim, asserted in their Third Amended Complaint may be determined by the Court based on the pleadings, papers, briefing and arguments of counsel. The issue for determination, as framed by the stipulation [was]: 'Whether Amendment No. 2 . . . to the University's 2005 [Plan] violates Section 5.1 of the [Settlement Agreement] . . . .'"

---

[4] The 2020 Long Range Development Plan ultimately became the 2021 Plan.

Following a hearing on April 15, 2022, the trial court adopted its tentative ruling and issued its May 25, 2022 judgment, which had as an attachment the court's final statement of decision. The trial court found that appellants had "failed to meet their burden of demonstrating that the University's adoption of Amendment No. 2 triggered its obligation under [section] 5.1 to perform a comprehensive analysis of alternative locations for the [housing project]." It therefore entered judgment for respondents.

Appellants timely appealed.

## II.    DISCUSSION

### A.    *Mootness*

As an initial matter, we address respondents' contention that appellants' claims are moot because the adoption of the 2021 Plan means that "the 2005 [Plan] is no longer in effect, [and] the [Settlement Agreement] has expired by its own terms." "An appeal is moot if it is impossible for an appellate court to grant an appellant any effectual relief." (*Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 641.) But "[g]enerally, the burden is on the party claiming mootness to establish that an appeal is moot." (*Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 927, fn. 4; see also *In re Pintlar Corp.* (9th Cir. 1997) 124 F.3d 1310, 1312 ["The party asserting mootness has a heavy burden to establish that there is no effective relief remaining for a court to provide."].)

Although respondents contend the adoption of the 2021 Plan has caused the 2005 Plan to expire, neither the 2005 Plan nor the 2021 Plan are in the record on appeal, and respondents cite to no provisions or language in either plan to support their contention. Respondents have not met their burden of establishing that appellants' challenge to the approval of the housing project, if successful, would have no impact on the 2021 Plan or any of the underlying assumptions or findings on which the 2021 Plan was approved. We will therefore consider the merits.

**B.** *Standard of Review and Legal Principles*

"The interpretation of a written instrument, even though it involves what might properly be called questions of fact, is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect." (*City of Bell v. Superior Court* (2013) 220 Cal.App.4th 236, 247.) " 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citation.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' " (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868.) We interpret the terms in context "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) "The words of a contract are to be understood in their ordinary and popular sense, . . . unless a special meaning is given to them by usage . . . ." (Civ. Code, § 1644; *Butler v. City of Palos Verdes Estates* (2005) 135 Cal.App.4th 174, 181.) "Where contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further." (*Ticor Title Ins. Co. v. Employers Ins. of Wausau* (1995) 40 Cal.App.4th 1699, 1707 (*Ticor*).) However, "[i]t is well settled that courts may consider extrinsic evidence insofar as it sheds light on a meaning to which the contract is reasonably susceptible." (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 538 (*Hewlett-Packard*).)

The facts here are undisputed; the parties disagree only as to the interpretation of the Settlement Agreement and whether respondents complied with its requirements. As we are faced with a question of law, our review of the judgment is de novo. (*Nava v. Mercury Casualty Co.* (2004) 118 Cal.App.4th 803, 805 ["When a trial court's interpretation of a written agreement is appealed and no conflicting extrinsic evidence was admitted, the interpretation of the contract is a question of law which we review de novo."].)

8

**C.** *"Major Amendment" Under Section 5.1*

Section 5.1 does not provide for the analysis of off-campus alternatives to accommodate growth upon any amendment of the 2005 Plan but only upon the next "major" one. The parties' disagreement accordingly turns on the meaning of "major amendment" as used in section 5.1 of the Settlement Agreement, though they both contend its language is "clear and explicit."

Appellants argue that the "next major amendment of the 2005 [Plan]," irrespective of its subject matter, triggers the need for a comprehensive analysis of alternative locations. Appellants parse section 5.1 as comprising two distinct parts: a trigger for when the analysis must take place—during the "the next major amendment to the 2005 [Plan]"—and the type of analysis—one of "potentially feasible alternative locations to accommodate proposed UCSC enrollment growth beyond that analyzed in the 2005 [Plan] EIR." Respondents maintain that "[u]nder the full language of Section 5.1, only the 'next major amendment' of the 2005 [Plan] that includes 'proposed UCSC enrollment growth beyond that analyzed in the 2005 [Plan] EIR' would trigger the alternatives analysis required by Section 5.1."

To understand the term "major amendment," we rely not on the parties' subjective views as expressed in their briefs but on the plain language of their agreement. (*Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 531 ["To interpret a contract, we look to its language ([Civ. Code] § 1638) and ascertain the intent of the parties, if possible, based solely on the contract's written provisions ([Civ. Code] § 1639)."].) "[I]f the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822.) Generally, when the language of a contract is clear, we do not go beyond it to attempt to ascertain the parties' intent. (*Ticor*, *supra*, 40 Cal.App.4th at p. 1707.)

Because the Settlement Agreement incorporates no express definition of "major amendment," we understand it in its " ' "ordinary and popular sense." ' " (See *Clarendon*

9

*America Ins. Co. v. North American Capacity Ins. Co.* (2010) 186 Cal.App.4th 556, 566.) And to the extent that "the 'ordinary' sense of a word is to be found in its dictionary definition" (*Scott v. Continental Ins. Co.* (1996) 44 Cal.App.4th 24, 30, fn. omitted), we construe "major" as "notable or conspicuous in effect or scope." (See Merriam-Webster Dict. Online (2023) <https://www.merriam-webster.com/dictionary/major> [as of July 28, 2023], archived at <https://perma.cc/85S9-8H7M>; see also *People v. Proby* (1998) 60 Cal.App.4th 922, 931.) We further understand the parties' resort to "major" as a qualifier in the broader context of the Settlement Agreement "taken as a whole." (See Civ. Code, § 1641 ["The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."].) For an amendment to the 2005 Plan to be a "major amendment" in the context of the Settlement Agreement, the change would need to materially alter the parties' expectations under the Settlement Agreement. We therefore examine the purpose of the Settlement Agreement.

Section 5.1 itself provides that it is "[i]n recognition of the purpose and intent of Measures I and J, as adopted in November 2006." To the extent the contents of these measures are extrinsic to the Settlement Agreement, we consider them to clarify the parties' intention in incorporating these by reference.[5] (See *Hewlett-Packard*, *supra*, 65 Cal.App.5th at p. 538.) Measure I, "An Ordinance to Promote Sustainable Growth in Santa Cruz by Opposing the Negative Impacts of Proposed University Growth" (codified at section 16.22.010 et seq. of the Santa Cruz Municipal Code <https://www.santacruzpl.org/files/ballot_measures/pdf/20061107_I.pdf> [as of Jul. 28, 2023], archived at <https://perma.cc/E6H5-JFGJ>, specified as its purposes "[t]o direct City officials to take whatever actions are within their legal power to avoid the significant adverse effects of University growth, particularly on the [City] housing

_____

[5] We take judicial notice of these measures on our own motion. (Evid. Code, § 452, subd. (h); *Yumori-Kaku v. City of Santa Clara* (2020) 59 Cal.App.5th 385, 430, fn. 12.)

market, traffic congestion, and water supply" and "[t]o refuse to provide City services to serve University growth unless the University pays the full costs constructing and operating such services." (*Id.* at § 2(2) & (3).) Measure I specifically noted the inadequacy of UCSC's housing commitment and the associated "inflationary effect on community rent levels." (*Id.* at § 3(11).) Measure J, "Utility Service Area Expansion," was adopted as section 1460 of the City of Santa Cruz's city charter <https://www.santacruzpl.org/files/ballot_measures/pdf/20061107_J.pdf> [as of Jul. 28, 2023], archived at <https://perma.cc/8NLV-S7AZ> "in order to preserve the limited remaining water capacity that is available to current utility users and in order to conserve capacity in the City's wastewater treatment plant."[6] It limited any expansion of City water and sewer or septic services to "property which . . . formerly received [such] service from another . . . source" that is "no longer viable or available," where "the applicant has demonstrated there is no viable alternative other than a connection to the City water [or sewer or septic] system."

We accordingly take the Settlement Agreement's reference to Measures I and J as reflecting the parties' mutual intent to target as "major" those amendments that increase UCSC growth and, by extension, its demands on the City's housing market, traffic infrastructure, water supply, and wastewater management, in excess of the growth agreed to in the Settlement Agreement.

Because "[c]ontractual language must be construed in the context of the contract as a whole, and in the circumstances of the case," we also look at other provisions of the Settlement Agreement to interpret the meaning of section 5.1 as understood by the parties at the time they entered into the agreement. (See *Southgate Recreation & Park Dist. v. California Assn. for Park & Recreation Ins.* (2003) 106 Cal.App.4th 293, 298.) The

---

[6] Although this section was "repealed by judicial decision" in 2007 (Santa Cruz Charter, § 1430), we nonetheless consider it material to the parties' mutual intent in reaching the Settlement Agreement.

other provisions of the Settlement Agreement are consonant with section 5.1's incorporation by reference of Measures I and J. The very first section of the Settlement Agreement (section 1.0) concerns enrollment. It projects combined graduate and undergraduate enrollment levels of 19,480 by 2020-2021 and caps undergraduate enrollment at 17,500. Section 2.0 addresses housing and requires the Regents to provide a specified number of beds for enrollment up to 15,000 students, and additional beds to accommodate 67 percent of enrollment above 15,000, totaling approximately 10,125 beds for its projected 2020-2021 enrollment. The Settlement Agreement describes this obligation on the part of UCSC as a minimum "housing commitment," noncompliance with which could be excused under enumerated circumstances. Although the Settlement Agreement states that UCSC housing "may be accommodated on or off campus," it places an emphasis on the construction of on-campus beds, specifically limiting "the number of new off-campus beds created in the City of Santa Cruz after the effective date of this Agreement to no more than 225 beds . . . ." Section 3.0 concerns UCSC's "existing and future water demand," including allocation and conservation measures, and section 4.0 concerns average daily traffic to the main campus.

Taken as a whole, the Settlement Agreement reflects the parties' intention to control UCSC enrollment growth—and ensure development of more on-campus housing to accommodate that controlled growth—as the primary means of limiting UCSC's demands on City traffic infrastructure, water supply, and housing market. Accordingly, it follows that a "major amendment" to the 2005 Plan—within the meaning of the Settlement Agreement—would be one predicated on enrollment growth beyond the stipulated levels.

Our construction comports with the express purpose of the "comprehensive analysis" that a "major amendment" triggers under section 5.1, which is "to accommodate proposed UCSC enrollment growth beyond that analyzed in the 2005 [Plan] EIR" and "tak[e] into consideration City of Santa Cruz infrastructure,"

12

particularly "transportation, water and housing."  Our construction is likewise consistent with this court's decision in *Community Water Coalition v. Santa Cruz County Local Agency Formation Com.* (2011) 200 Cal.App.4th 1317, where we recognized the purpose of the Settlement Agreement was to address "concern[s] about the impact the proposed expansion [under the 2005 Plan] would have upon City services."  (*Id.* at p. 1321 [affirming trial court judgment sustaining UCSC's demurrer to complaint and petition for writ of mandate challenging local commission's jurisdiction to approve Settlement Agreement].)

**D.      *Amendment No. 2***

**1.      *Increased Enrollment***

Anticipating our interpretation of "major amendment," appellants alternatively contend that Amendment No. 2 is "major" in that it "enable[s] growth and development beyond that contemplated in both the [Settlement Agreement] and the 2005 [Plan]." They assert that "[b]y adding the 2018-2019 undergraduate enrollment of 16,983 to the proposed addition of 2,712 undergraduate beds, the University is proposing the development of 19,695 undergraduate beds.  Those 19,695 beds accommodate 2,195 more undergraduate students than are permitted under the CSA's 17,500 cap."  We reject Appellants' assertion, based as it is upon what the trial court recognized to be a specious one-for-one equation of current enrollment and existing beds.

The record makes clear that it was UCSC's inability to provide housing—on or off campus—for enough of its students that was a principal driver of the litigation culminating in the Settlement Agreement.  Notably, nothing in the Settlement Agreement suggested that the student-to-bed ratio would ever reach one-to-one, as appellants' math presumes:  rather, UCSC agreed to provide 7,135 beds for enrollment up to 15,000 and additional beds for 67 percent of enrollment above 15,000.  UCSC further agreed to "limit the number of new off-campus beds created in the City of Santa Cruz after the effective date of this Agreement to no more than 225 beds."  No signatory to the

13

Settlement Agreement could have reasonably believed that UCSC would ever provide on-campus housing for every undergraduate student.

Moreover, nothing in the record suggests that UCSC in the years since the execution of the Settlement Agreement managed to house all 16,983 of its undergraduates: There were approximately 9,399 university-controlled beds as of 2017; the addition of 3,000 new beds would not exceed the student population at UCSC as appellants contend. There is no evidence that Amendment No. 2 would result in an increase of enrollment at UCSC beyond the expectations of the parties to the Settlement Agreement.

### 2. *Land-Use Designation*

Appellants in the alternative assert that Amendment No. 2 was a "major amendment" because the Hagar site comprises "17 acres of pristine meadow in the southeast portion of the campus"—the East Meadow—which appellants characterize as "an area protected from development under the 2005 [Plan] . . . ."

The record does not support appellants' characterization of the East Meadow as "protected." As respondents note, the record evidence reflects that the 17-acre Hagar site had previously been designated as "Campus Resource Land," not as "Protected Landscape." The designation "Protected Landscape" in the 2005 Plan was reserved for "special campus landscapes for their scenic value and to maintain special vegetation and wildlife continuity zones and, to the extent feasible, would be retained in an undeveloped state as the campus grows." "Campus Resource Land" signifies "land[] not planned for development during the 2005 [Plan] timeframe but . . . reserved for future use by the campus." The 2005 Plan specifically provided for the redesignation and development, if needed, of Campus Resource Land upon additional environmental review.

The 2005 Plan, by prescribing a procedure for redesignating Campus Resource Land for development and by distinguishing Campus Resource Land from Protected Landscape, plainly anticipated the potential development of Campus Resource Land

14

pending a future Long Range Development Plan.  And in approving Amendment No. 2, respondents complied with that prescribed procedure.  They conducted additional environmental review by preparing a revised EIR and sought a plan amendment.[7]  The fact of this additional environmental review does not render the resulting plan amendment a major one within the meaning of section 5.1.

We acknowledge that the development of scenic, vulnerable, or otherwise protected land—irrespective of prior designation—could amount to a major amendment in contexts other than interpretation and enforcement of the Settlement Agreement.  But we are called upon to discern the intent of the parties in executing the Settlement Agreement, based on its language and not on the broader interests of environmental protection generally.  Nothing in the Settlement Agreement suggests that the independent objective of wilderness preservation—as opposed to the sustainability of growth given impacts on City services—informed the parties' definition of "major amendment" in section 5.1.

Based on the foregoing, we are unable to conclude that Amendment No. 2 constitutes what the parties to the Settlement Agreement conceived of as a "major amendment" to the 2005 Plan.  Consequently, Amendment No. 2 did not trigger the requirement for the comprehensive analysis called for in section 5.1.

### III.   DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

---

[7] We reached a similar conclusion in *East Meadow*, *supra*, H048695 [nonpub. opn.] the 2020 CEQA challenge to the housing project plan, where we observed that "changing the land use designation of campus resource land to allow development was expressly contemplated in the 2005 [Plan]," and that "development of family student housing on the Hagar site, as analyzed in the [housing] project EIR, is consistent with the 2005 [Plan] as it pertains to family student housing."

15

 

_____
                                        LIE, J.

WE CONCUR:

_____
GREENWOOD, P.J.

_____
GROVER, J.

*Stevens v. Regents of the University of California*
H050230