100 Cal.Rptr.2d 699 (2000)
84 Cal.App.4th 181
COMMERCIAL UNDERWRITERS INSURANCE COMPANY, Petitioner,
v.
The SUPERIOR COURT of Los Angeles County, Respondent;
Gulf Underwriters Insurance Company et al., Real Parties in Interest. [And four other petitions.[*]]
No. B139105.
Court of Appeal, Second District, Division Seven.
October 16, 2000.
Ordered Not Officially Published February 14, 2001.[**]
*701 Roper & Folino and Joseph L. Stark, Los Angeles, for Petitioner and Real Party Commercial Underwriters Insurance Company.
Shupe, Reagan & Wyne and Elaine W. Reagan, for Petitioner and Real Party Fireman's Fund Insurance Company.
Perlstein & Robbins, John J. Perlstein, Lisa A. Perrott, Los Angeles; Musick, Peeler & Garrett, David A. Tartaglio and Cheryl A. Orr, Los Angeles, for Petitioner and Real Party Royal Insurance Company of America.
Zimmerman & Kahanowitch, Brian F. Zimmerman and Dee-Ann Jenkins, Woodland Hills, for Petitioner and Real Party Gulf Underwriters Insurance Company.
No appearance for Real Party in Interest Continental Insurance Co.
Hanson, Bridgett, Marcus, Vlahos & Rudy and Linda E. Klamm, San Francisco, for Real Party Arnold Siegel.
No appearance for Respondent.

*700 WRIT OF MANDATE
JOHNSON, J.
This is an insurance coverage dispute among five insurers. The five consolidated petitions present two questions, one procedural and the other substantive. First, did Judge Valerie Baker have jurisdiction to rule Fireman's Fund Insurance *702 Company (Fireman's Fund) and Commercial Underwriters Insurance Company (Commercial Underwriters) did not have a duty to defend in the underlying case, when Judge Hugh C. Gardner III had ruled, just two weeks earlier, all the defendant insurers did have such a duty? Second, which ruling regarding coverage was correct? We hold Judge Gardner was correct in finding potential coverage based on Abigail Adams's alleged "bodily injury" caused by a potentially covered "occurrence." However we hold Judge Gardner erred in finding Commercial Underwriters and Fireman's Fund had a duty to defend because we find coverage was barred by the "business pursuits" exclusions in their policies (though not by the "employee" exclusion in Royal Insurance Company of America (Royal's) policy). We also hold Judge Baker exceeded her jurisdiction in ruling on Fireman's Fund's and Commercial Underwriters' motion. Accordingly, we vacate all the orders at issue in these consolidated petitions, with the exception of Judge Gardner's order granting summary adjudication in favor of Gulf and against Royal.

FACTS AND PROCEEDINGS BELOW

The Underlying Complaint
In 1983, Abigail Adams worked for EST and was supervised by Arnold Siegel. In a lawsuit filed in 1996, Adams alleged for 12 years she and Siegel had a "many-faceted relationship" in which he was her "teacher, therapist, counselor, tutor, employer and a person who undertook the responsibility, for money, to psychologically rescue and make her a better person, psychologically." Adams characterized this as a "consumer" relationship. She alleged by commencing a "sexual but non-dating" relationship with her, Siegel took advantage of her vulnerability as an employee and her need for psychological help from EST.
In 1985, Siegel opened an offshoot of EST called The Conversation, and asked Adams to move to New York and open an office for The Conversation.[1] Adams alleges she was "told to work from 9:00 a.m. to 9:00 p.m. on a small budget, thus placed under psychological strain that was counterproductive to the psychological needs for which help had been promised" by Siegel. She further alleges Siegel promised he would be committed to her and their relationship.
The gravamen of the complaint was Siegel controlled, manipulated, and sexually and psychologically abused Adams while providing "diagnostic and therapeutic procedures of a therapeutic nature for which a license is required under California law," despite the fact Siegel was not licensed as a therapist. The complaint asserted causes of action for negligence, fraud, sexual harassment, battery, breach of contract, and intentional infliction of emotional distress. In the first cause of action for negligence, Adams alleged Siegel "owed a special duty not to act in any way that would cause damage" to her, because Siegel had made a promise to "provide an environment and services designed to make her a better person, increase [sic] and deal with her psychological problems, and increase her wealth." She alleged Siegel breached this duty by sexually abusing her, creating hopes he would one day marry her, counseling her not to have children, impeding her ability to develop an independent life, making her dependent upon him, engaging in dual relationships, taking advantage of her by employing her as a recruiter for The Conversation, failing to provide proper therapeutic treatment, and failing to refer her to "proper therapeutic help of which Defendants were not qualified to provide."
Adams's complaint alleged as damages only "emotional and financial harm[,] lost direction in life and [loss of] ten years of independent life." However, in her discovery responses Adams also claimed Siegel's conduct caused her to suffer various physical ailments including stomach pain, headaches, skin problems, and infertility.

*703 The Coverage Action

Siegel tendered the defense of the action to his five insurers: Gulf Underwriters Insurance Co., Commercial Underwriters Insurance Co., Royal Insurance Co., Fireman's Fund Insurance Co., and Continental Insurance Co.[2] Gulf, as Siegel's errors and omissions carrier, agreed to provide a defense and immediately sued the other insurers for declaratory relief when they refused to contribute to the defense. Gulf alleges all the insurers are obligated to provide a defense because there was a potential for coverage under the "bodily injury" and "personal injury" provisions of the various policies.

The "Duty to Defend" Motions
On October 5, 1999, Gulf filed a motion for summary adjudication against the defendant insurers, seeking to establish their duty to defend Siegel in the Adams action. In its motion, Gulf argued because Adams separately pleaded negligence, under Gray v. Zurich (1966) 65 Cal.2d 263, 277, 54 Cal.Rptr. 104, 419 P.2d 168, there was a potential for coverage and thus a duty to defend. It further argued there was a potential for coverage for "bodily injury" because Adams's discovery responses described physical symptoms caused by Siegel's conduct. Finally, it argued there was an "occurrence" because "although it appears that much of the conduct alleged is intentional and may not constitute an `accident' giving rise to an `occurrence,' for purposes of the duty to defend it is sufficient that there is at least one allegation of conduct that is not intentional creating the potential that a claim may be covered under the policy. In the underlying action, Ms. Adams's first cause of action against Siegel is negligence. By definition, negligent acts are not intentional and fall squarely within the policy definition of `occurrence.' Since Siegel could potentially be found liable for negligent conduct, there is the potential for coverage under the Defendants' policies."
On or about October 21, 1999, Commercial Underwriters filed a motion for summary judgment, asking the court to find it had no duty to defend or indemnify Siegel in the Adams action. In its motion, Commercial Underwriters argued there was no "occurrence" within the meaning of the policy, because the conduct alleged in the Adams complaint was intentional. It further argued even if there was an "occurrence," it had no duty to defend or indemnify because as an excess carrier, it could not have any defense obligation as long as any other carrier had such an obligation, and Gulfs admitted defense obligation precluded any defense obligation on the part of Commercial Underwriters. Finally, it argued as an excess carrier it had no possible duty to indemnify Siegel because the Adams lawsuit had already settled for an amount less than any primary carrier's policy limits.
The motions were assigned for hearing to Judge Gardner, who according to Commercial Underwriters was primarily assigned to traffic court matters in Department T at the Santa Monica courthouse. Judge Gardner heard Gulfs motion for summary adjudication on November 10, 1999, and took the matter under submission.
On December 9, 1999, while the parties were still waiting for a ruling on Gulfs motion, Fireman's Fund filed its own motion for summary judgment, arguing it had no duty to defend because Gulf could not establish the Adams action sought recovery for "bodily injury" caused by a covered *704 "occurrence." Fireman's Fund also argued there could be no potential for coverage because of various exclusions in its policies.
Judge Gardner heard Commercial Underwriters' motion for summary judgment on December 10, 1999, and denied the motion because "this is the Montrose case, where it says the insured need only show that it may have coverage. The insurer has to prove it doesn't. So I'm going to put down `denied' on this one." He declined to take Commercial Underwriters' motion under submission pending his decision on Gulfs and Fireman's Fund's motions.
On January 3, 2000, Commercial Underwriters joined in Fireman's Fund's motion. In its joinder, Commercial Underwriters stated "It should be noted that CUIC's own Motion for Summary Judgment was denied in this matter upon what CUIC considers to be erroneous legal grounds.... Were this court to grant Fireman's Motion without granting CUIC's joinder, such an action would create the very real existence of contradictory verdicts upon the same essential facts and circumstances."
On January 28, 2000, almost three months after taking Gulfs motion under submission, Judge Gardner issued his order thereon. The order stated defendants had a duty to defend because there was a potential for damages from "bodily injury" as the result of an "occurrence." It recited the policies' definitions of "bodily injury,"[3] and concluded the defendant insurers had a duty to defend based on Adams's claimed "actual physical injury." Judge Gardner's order did not address the insurers' argument there was no "occurrence" within the meaning of the policies.
Department T was apparently eliminated after Judge Gardner issued his January 28 order, and Fireman's Fund's motion was transferred for hearing to department B-H of the court, located in Beverly Hills. Judge Valerie Baker heard Fireman's Fund's motion in department B-H on February 9, 1000. In her tentative ruling, Judge Baker opined Fireman's Fund and Commercial Underwriters had no duty to defend because all the alleged conduct was intentional and thus there was no "occurrence." However the tentative ruling also raised the question whether Fireman's Fund's motion and Commercial Underwriters' joinder were improper in light of Judge Gardner's prior ruling.
Fireman's Fund submitted a supplemental brief on February 9, 2000. It argued Judge Baker had the authority to rule on its motion, despite Gulfs earlier motion, pursuant to Liberty Mutual Ins. Co. v. Superior Court (1997) 58 Cal.App.4th 617, 68 Cal.Rptr.2d 219, which held an insurer may contest its duty to defend even though a prior motion for summary adjudication has established the existence of such a duty. It also argued its motion was proper because it had not brought a prior motion for summary judgment and because its motion for summary judgment was "different" from Gulfs motion for summary adjudication.
Judge Baker granted Fireman's Fund's motion and Commercial Underwriters' joinder on February 14, 2000.[4] The minute order stated: "the court finds that the Motion of Fireman's is not an impermissible motion for reconsideration. See grounds set forth in Fireman's Supplemental Brief, filed on February 9, 2000 and the case of Liberty Mutual Ins. Co. v. Superior Court (1997) 58 CA 4th 617[, 68 Cal. Rptr.2d 219]." The order, prepared by Fireman's Fund's counsel and filed on February 17, stated "Fireman's Fund's Motion for Summary Judgment is not an impermissible Motion for Reconsideration *705 but is a different motion. Additionally the court finds that an insurer may bring summary judgment, without submitting newly discovered facts or law on the issue of its duty to defend at any time despite the fact that there has been a prior Motion for Summary Adjudication finding a duty to defend. [Liberty Mutual Insurance v. Superior Court (1997) 58 Cal.App.4th 617[, 68 Cal.Rptr.2d 219].]" Judge Baker also overruled Gulfs objection to Fireman's Fund's joinder. She was not asked to, and did not, vacate Judge Gardner's order granting Gulfs motion for summary adjudication.
Gulf filed a petition for a writ of mandate directing Judge Baker to vacate her order granting summary judgment in favor of Fireman's Fund and Commercial Underwriters. Fireman's Fund, Commercial Underwriters, and Royal filed petitions for a writ of mandate directing Judge Gardner to vacate his order granting summary adjudication in favor of Gulf. Commercial Underwriters also filed a petition for a writ of mandate directing Judge Gardner to vacate his order denying its original motion for summary judgment. Continental did not file a writ petition.
On April 21, 2000, we consolidated the five writ petitions and issued an order to show cause which order (the January 28, 2000 order granting summary adjudication or the February 14, 2000 order granting summary judgment) should be vacated. On June 20, 2000, we informed the parties by letter we would also consider reversing Judge Gardner's December 10, 1999 order denying Commercial Underwriters' motion for summary judgment.

DISCUSSION

I. JUDGE GARDNER WAS CORRECT IN FINDING A DUTY TO DEFEND BECAUSE THE ADAMS ACTION ADEQUATELY ALLEGED "BODILY INJURY" CAUSED BY AN "OCCURRENCE."

In Montrose Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287, 24 Cal. Rptr.2d 467, 861 P.2d 1153, our Supreme Court held an insured's motion for summary adjudication to establish the insurer's duty to defend must be granted, unless the insurer is able to demonstrate a basis for a summary judgment establishing the absence of such a duty. "To prevail, the insured must prove the existence of a potential for coverage, while the insurer must establish the absence of any such potential. In other words, the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot." (Id. at p. 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.)
In a motion for summary adjudication seeking to establish a duty to defend, the initial burden is on the moving party to demonstrate the allegations in the underlying action fall within the basic coverage of the policy. (Royal Globe, supra, 181 Cal. App.3d 532, 537, 226 Cal.Rptr. 435.) Only then does the burden shift to the insurer to show the claim falls within an exclusion. (Montrose, supra, 6 Cal.4th 287, 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.) Gulf recognizes this formulation, but contends it met its burden of showing a potential for coverage in the first instance. We agree, finding as a matter of law the potential for coverage based on an "occurrence" causing "bodily injury."
Page five of Judge Gardner's January 28, 2000 order granting Gulfs motion for summary adjudication contained the following heading: "Defendants have a Duty to Defend Since There is the Potential for Damages from `Bodily Injury' as the Result of an `Occurrence.'" The discussion under the heading dealt only with the definition of "bodily injury" in defendants' policies, and concluded: "In short, Adams has claimed to have suffered actual physical injury of exactly the sort which is specified in their policies. These are policies that the defendant insurers have a duty to defend. Plaintiff Gulfs motion is *706 granted." The order did not include any discussion or analysis of the policies' definition of "occurrence," which provides coverage only for an "accident," or of the exclusions in the defendants' policies. We may affirm an order granting summary adjudication if it is correct for any reason, and we find there was an "occurrence" sufficient to trigger the duty to defend.
While we find the underlying complaint adequately alleged an "occurrence" based on a "bodily injury," and thus affirm Judge Gardner's order as to defendant Royal, we vacate Judge Gardner's orders as to Commercial Underwriters and Fireman's Fund, because we find coverage barred by the "business pursuits" exclusions in those policies.

A. The Adams Complaint Adequately Alleged "Bodily Injury" Within the Meaning of Defendants' Policies.

Judge Gardner's January 28, 2000 order granting Gulfs motion for summary adjudication stated "`Bodily Injury' means `bodily injury, sickness or disease sustained by a person ...' according to policies by Royal and Fireman's Fund.... Continental's policy says the same, and also includes mental anguish.... Commercial has all of the above, plus `shock.'" This appears to be a correct statement of the policy terms. While Fireman's Fund and Commercial Underwriters apparently concede adequate allegations of "bodily injury" in the Adams action, Royal contends its policy defines "bodily injury" more narrowly and thus Adams's claims do not trigger coverage under its policy. We disagree.
Royal's policy defines "bodily injury" as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." Adams's complaint did not allege any facts constituting bodily injury. In granting Gulfs motion, however, Judge Gardner relied on Adams's responses to interrogatories, which alleged as damages physical symptoms including "a brief reactive psychosis, a pre-ulcer condition in plaintiffs stomach (including physical pain), headaches, body shaking, nervousness, shocked nervous system with resulting weakness and fatigue," and others. We agree such extrinsic evidence may properly be considered by a court making a determination of the duty to defend. (Montrose Chemical Corp. v. Superior Court (1993) 6 Cal.4th 287, 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153.)
Royal argues "allegations of emotional distress damages, including allegations of resultant physical symptoms of that emotional distress, do not create coverage in the absence of any allegations that the insured's [sic] caused any physical injury or property damage to the claimants falling within the scope of a CGL policy's insuring agreement." This is true. In this case, however, there are allegations of physical injury caused by Siegel's conduct. In her discovery responses, Adams stated Siegel's actions caused physical injuries including stomach problems, skin problems, and back pain. We agree with Judge Gardner these constitute "actual physical injury of exactly the sort which is specified in [defendants'] policies."
In urging us to find no "bodily injury," Royal relies on Aim Insurance Co. v. Culcasi (1991) 229 Cal.App.3d 209, 220, 280 Cal.Rptr. 766, which held the term "bodily injury" "does not include emotional distress in the absence of physical injury." (Emphasis added.) We agree with this statement of the law; however we do not agree it applies in this case. Here, Adams did indeed allege physical as well as emotional injuries caused by Siegel's alleged improper conduct. Therefore Aim Insurance does not control
Royal also relies on a line of cases following Keating v. National Union Fire Ins. Co. (1993) 995 F.2d 154, 156-157, holding "bodily injury"coverage does not arise where a plaintiff claims emotional distress resulting from an underlying business tort. In Keating, the plaintiffs alleged their investment *707 losses caused emotional trauma including physical symptoms. The Ninth Circuit refused to find a duty to defend under a "bodily injury" policy because to do so would "expand coverage of these policies far beyond any reasonable expectation of the parties to sweep within their potential coverage any alleged emotional or physical distress that might result from economic loss that is itself clearly outside the scope of the policy." (Id. at p. 156. Accord, American International Bank v. Fidelity & Deposit Co. of Maryland (1996) 49 Cal.App.4th 1558, 1569-1570, 57 Cal. Rptr.2d 567 [no duty to defend borrowers' lawsuit against lender despite borrowers' allegations of emotional distress including physical symptoms due to failed loan transaction]; Ticor Title Ins. Co. v. Employers Ins. of Wausau (1995) 40 Cal. App.4th 1699, 1705, 48 Cal.Rptr.2d 368 [no duty to defend against suit by investors who lost their retirement savings, despite allegations of emotional trauma]; McLaughlin v. National Union Fire Ins. Co. (1994) 23 Cal.App.4th 1132, 1150-1151, 29 Cal.Rptr.2d 559 [no duty to defend even though disgruntled investors claimed physical and emotional distress]; Chatton v. National Union Fire Ins. Co. (1992) 10 Cal.App.4th 846, 857, 13 Cal.Rptr.2d 318 [no coverage for emotional trauma suffered by investors who suffered financial losses where no physical symptoms alleged].)
In this case, by contrast, we are not faced with a claim for business torts and monetary losses, with an emotional distress claim tacked on in an attempt to create insurance coverage. Adams's physical symptoms are alleged to be directly caused by Siegel's conduct, rather than by some intervening economic losses. We agree with the Supreme Court of New Jersey, which found coverage for such injuries in Voorhees v. Preferred Mutual Insurance Co. (1992) 128 N.J. 165, 607 A.2d 1255, 1261. In Voorhees, the court held: "We conclude that the term `bodily injury' is ambiguous as it relates to emotional distress accompanied by physical manifestations. That ambiguity should be resolved in favor of the insured. [Citations.] Moreover, we find such an interpretation to be in accord with the insured's objectively-reasonable expectations. That `emotional distress can and often does have a direct effect on other bodily functions' is well recognized. [Citations.] An insured who is sued on account of an injury involving physical symptoms could reasonably expect an insurance policy for liability for bodily injuries to provide coverage."[5] We believe this approach is consistent with the holding in Aim Insurance, supra, 229 Cal. App.3d 209, 220, 280 Cal.Rptr. 766, and with sound public policy. Therefore we find at least a potential for coverage under all the defendants' bodily injury provisions.

B. The Adams Action Raised the Possibility of Liability Based on an "Accident."

All the defendant insurers' policies require an allegation of "bodily injury," caused by an "occurrence," before coverage is triggered. In each of the policies, an "occurrence" is defined as an "accident."[6] Our Supreme Court, in Hogan v. *708 Midland National Insurance Company (1970) 3 Cal.3d 553, 91 Cal.Rptr. 153, 476 P.2d 825, has defined "accident" to include an "unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause." (Id. at p. 559, 91 Cal.Rptr. 153, 476 P.2d 825 [emphasis added].) Similarly, we held in Insurance Company of the West v. Haralambos Beverage Co. (1987) 195 Cal.App.3d 1308,1318, 241 Cal.Rptr. 427, "`In its plain and ordinary sense, "accidental" means "arising from extrinsic causes; occurring unexpectedly or by chance[; or] happening without intent or through carelessness."'" (Emphasis added.) We find this definition broad enough that we cannot foreclose the possibility of an "accident" in the Adams action. Accordingly, we find the "occurrence" requirement was satisfied for purposes of the defendants' duty to defend.

1. Merced Mutual Ins. Co. v. Mendez and its Progeny Improperly Exclude Unintended Consequences of Intentional Acts From the Definition of an "Accident."

The defendant insurers, relying on a line of California cases beginning with Merced Mutual Insurance Co. v. Mendez (1989) 213 Cal.App.3d 41, 261 Cal.Rptr. 273, argue the term "accident" is unambiguous and excludes any conduct intended by the insured, as well as any unexpected or unintended consequences from such conduct. (See also American International Bank v. Fidelity and Deposit Company of Maryland (1996) 49 Cal.App.4th 1558, 1572-1573, 57 Cal.Rptr.2d 567 [an "occurrence," defined as an "accident," means conduct without intent].) Therefore, they argue, because all the conduct alleged in the Adams complaint was intentional, there was no duty to defend even if Siegel did not intend the alleged resulting harm to Adams. We find the "intentional act vs. intentional harm" analysis in Mendez overly simplistic and decline to follow it to the extent it sets up an artificial and, we think, untenable distinction between an unintentional act and an intentional act which nevertheless causes unintended harm.
We begin our discussion by reviewing Mendez, supra, 213 Cal.App.3d 41, 261 Cal.Rptr. 273, and the California cases following it. In Mendez, the insured under a homeowner's policy was sued by a woman alleging sexual assault, battery, and infliction of emotional distress. The victim alleged a "brutal physical attack culminating in forced oral copulation." (Id. at p. 44, 261 Cal.Rptr. 273.) The insured admitted engaging in sexual conduct with the plaintiff, but claimed the conduct was consensual. (Ibid.) As in this case, the CGL policy at issue provided coverage for bodily injury caused by an "occurrence," defined as an "accident." (Id. at p. 45, 261 Cal.Rptr. 273.)
The insured contended an "accident occurs even if the acts causing the alleged damage were intentional as long as the resulting damage was not intended." (Mendez, supra, 213 Cal.App.3d 41, 48, 261 Cal.Rptr. 273.) The Court of Appeal rejected this argument, holding "the means as well as the result must be unforeseen, involuntary, unexpected and unusual." (Ibid.) Thus, the court held there was no "accident" in Mendez because "All of the acts, the manner in which they were done, and the objective accomplished occurred exactly as appellant intended. No additional, unexpected, independent or unforeseen act occurred." (Ibid.)
Shortly after the decision in Mendez, our Supreme Court in J.C. Penney Casualty Insurance Company v. M.K. (1991) 52 Cal.3d 1009, 278 Cal.Rptr. 64, 804 P.2d 689, enunciated a per se rule precluding insurance coverage (and thus precluding a duty to defend) in cases of child molestation. In J.C. Penney, the insured argued "his intent was to have sex with a child, but his motive was wholesome," thus he did not intend to harm the child, thus his *709 conduct was "accidental" for purposes of a defense under his CGL insurance policy. (Id at p. 1026, 278 Cal.Rptr. 64, 804 P.2d 689.) The Supreme Court rejected this argument, stating "Some acts are so inherently harmful that the intent to commit the act and the intent to harm are one and the same. The act is the harm. Child molestation is not the kind of act that results in emotional and psychological harm only occasionally. The contrary view would be absurd." (Ibid.) Therefore, the court held, "under California law child sexual molestation is not covered by a homeowner's liability policy." (Ibid.) The Supreme Court did not hold an intentional act resulting in unintended harm could never constitute an "accident" within the meaning of a standard CGL policy.
Nevertheless, the Court of Appeal followed the Mendez "intentional conduct" rule in Quan v. Truck Ins. Exchange (1998) 67 Cal.App.4th 583, 79 Cal.Rptr.2d 134, another case cited by defendants, in which the insured had sexual relations with a minor. The minor sued for various intentional torts and also (in an apparent attempt to get around the J.C. Penney rule) for "negligent touching." The insured, whose policy provided coverage for "bodily injury" caused by an "occurrence" (defined as an "accident"), sued his insurance company for a defense, claiming "the causes of action for negligence and negligent infliction of emotional distress in the underlying complaint `obviously' gave rise to a duty to defend." (Id. at p. 598, 79 Cal.Rptr.2d 134.) The Court of Appeal rejected this argument, holding "This contention fails the test stated in Mendez. The insured may have `negligently' embraced and kissed claimant in the sense that he violated some duty of care in doing so, but there is no allegation that his allegedly negligent but nevertheless intentional conduct led to some `additional, unexpected, independent and unforeseen happening' constituting an accident. [Citation.] [¶] In other words, injurious physical contact may have been a `mistake,' but it was no `accident.'" (Id. at pp. 598-599, 79 Cal.Rptr.2d 134.)
In our view, Quan could and should have been decided without reference to the Mendez "intent" rule, relying instead on the special rule for child molestation set forth in J.C. Penney, supra, 52 Cal.3d 1009, 1026, 278 Cal.Rptr. 64, 804 P.2d 689. While precluding insurance coverage for child molestation and other inherently wrongful sexual acts[7] may be a sound public policy (although we could argue to the contrary without much difficulty based on concern for proper compensation for the victims of such conduct), that policy does not mandate a preclusion of coverage for all actions involving allegations of sexual impropriety, especially in this case where the conduct was allegedly consensual.
We believe the Mendez court's understandable abhorrence for the conduct alleged led it to adopt an unworkable brightline rule which fails to take into account acts done intentionally but carelessly, leading to unexpected and unintended harm.[8] *710 While the specific conduct by Mendez may have been so brutal as to constitute "harm" in and of itself (thus falling within the rule set forth in J.C. Penney, supra, 52 Cal.3d 1009, 1026, 278 Cal.Rptr. 64, 804 P.2d 689), we are not prepared to hold sexual contact under a mistaken belief in consent would in all cases fall outside the definition of "accidental."

2. The Better Rule Defines "Accident" to Include Unintended Harm Flowing From Intentional Acts.

We believe a more workable approach to interpreting the "occurrence/accident" provision is that set forth by the Supreme Court of New Jersey in Voorhees, supra, 128 N.J. 165, 607 A.2d 1255. In Voorhees, Eileen Voorhees, the insured, attended a school board meeting and made comments questioning the teacher's competency and fitness. The teacher was relieved of her duties pending an investigation, and the incident was covered in the local press, including quotes from Voorhees about alleged "serious problems" with the teacher. (Id. at p. 1257.) After the teacher was found fit and returned to teaching, she brought suit against Voorhees, claiming extreme emotional distress. (Id at p. 1258.) As in this case, interrogatory responses indicated the underlying plaintiff had suffered various physical complaints including "headaches, stomach pains, nausea [and] body pains." (Ibid.)
In analyzing the insurer's claim it did not owe a duty of defense under Voorhees's CGL homeowners' insurance policy, the court held: "The key interpretive question is what should be deemed `accidental': the act or the injuries resulting from the act?" (Voorhees, supra, 128 N.J. 165, 607 A.2d 1255,1263.) After reviewing cases from New Jersey as well as other jurisdictions, it held "We adhere to the prevalent New Jersey rule and hold that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is `accidental,' even if the act that caused the injury was intentional. That interpretation prevents those who intentionally cause harm from unjustly benefiting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing. It also accords with an insured's objectively-reasonable expectation of coverage for unintentionally-caused harm." (Id. at p. 1264.)
A similar result was reached in Capitol Indemnity Corporation v. Blazer (1999) 51 F.Supp.2d 1080, in which a federal district court applying Nevada law adopted the "intent to do harm" test. In Capitol Indemnity, the insured was found guilty of assault and battery, but contended his CGL carrier had a duty to defend because he did not intend to cause the victim's injuries, which included permanent loss of sight in one eye. (Id. at pp. 1082-1083.) The court agreed with the insured's legal analysis and found the insured's intent to do the harm was a question of fact, and in determining whether there was an "accident" within the meaning of the policy, "the Court must examine whether Blazer, the insured in this case, expected or intended [the victim's] resulting bodily injuries." (Id. at p. 1086.)[9]
*711 This approach, focusing on "intent to do harm" as opposed to "intent to do the act," is fully consistent with the "inherently harmful" analysis articulated by our Supreme Court in J.C. Penney, supra, 52 Cal.3d 1009, 1026, 278 Cal.Rptr. 64, 804 P.2d 689. The Voorhees court noted "When the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure. That objective approach focuses on the likelihood that an injury will result from an actor's behavior rather than on the wrongdoer's subjective state of mind. The Appellate Division adopted an objective test in Atlantic Employers v. Tots & Toddlers, 239 N.J.Super. 276, 571 A.2d 300 (App. Div.), cert, denied, 122 N.J. 147, 584 A.2d 218 (1990), where the insured was sued for his sexual abuse of children in a day-care center. The court noted the general rule that coverage exists `for the unintended results of an intentional act * * *.' Id. 239 N.J.Super. at 281, 571 A.2d 300 [citation]. Nonetheless, the court, citing several out-of-state decisions holding that sexual assault of children is so inherently injurious that it can never be an accident, held that `[a]s a matter of public policy and logic * * * the better rule warrants application of the objective approach,' [citation], according to which the intent to injure would be presumed from the performance of the act. [Citation.]" (Id. at p. 1265,) This "intent to do the act is intent to do harm" analysis provides an alternative, more workable framework for deciding cases involving abhorrent acts such as those alleged in Quan and Mendez.
In this case, as counsel for Siegel noted at oral argument, while there are allegations of sexual misconduct in the Adams complaint, this case is not all about sex. Whether coverage may be based on Siegel's alleged improper psychological treatment of Adams, and failure to refer her to proper therapeutic help, simply is not susceptible to the clear-cut, simplistic Mendez analysis. The conduct of psychological treatment, whether licensed or unlicensed, competent or incompetent, does not lend itself to neat categorization as "intentional" or "unintentional."[10] It is also not all as clearly wrongful as child molestation or sexual assault. Therefore our inquiry does not end by applying the J.C. Penney "inherently harmful act" rule. (See Horace Mann Ins. Co. v. Barbara B. (1993) 4 Cal.4th 1076, 1083, 17 Cal.Rptr.2d 210, 846 P.2d 792 [even though no possibility of coverage for sexual molestation, "the complaint evinced a possibility that Gary Lee would be held liable for damage within the coverage of the policy stemming from Lee's negligent nonsexual conduct in his public relationship with Barbara."].)[11] Instead, *712 we apply the Voorhees analysis to determine whether Adams alleged an "accident" as defined in that case.[12]
In response to our request that Gulf identify allegations in the Adams complaint constituting "accidental" acts, Gulf pointed to paragraphs 17 and 18 of the complaint, which include far more than sexual impropriety:
"17. As a stated teacher, counselor, therapist, employer and good Samaritan, having made promise to Plaintiff to provide an environment and services designed to make her a better person, increase [sic] and deal with her psychological problems, and increase her wealth, Defendants, and each of them, owed a special duty not to act in any way that would cause damage to the Plaintiff.
"18. Defendants, and each of them, breached this duty, by allowing Defendant Siegel to sexually abuse Plaintiff, create hopes in Plaintiff that Defendant Siegel would one day marry Plaintiff, counsel her not to have children, impeded her ability to develop an independent life, made her dependant upon Defendants, and each of them, engaged in dual relationships, took advantage of Plaintiff by employing her as a voluntary recruiter for Defendants, improperly treated Plaintiff, and failed to refer her to proper therapeutic help of which Defendants were not qualified to provide."
In short, Gulf argues, Adams might prevail against Siegel by proving he undertook the actions alleged in the complaint with the intent to help Adams, and unintentionally ended up harming her. We hold such a scenario would indeed constitute an "accident" within the meaning of defendants' policies. For example, the evidence as developed might show Siegel did not intend to create hopes that he would one day marry Adams, but those hopes arose in Adams unexpectedly or as a result of carelessness on Siegel's part. Similarly, the failure to refer Adams to "proper therapeutic help" may have been the result of carelessnesswhich even the Mendez court recognized can constitute an "accident."[13] As our Supreme Court held in Hogan v. Midland National Ins. Co. (1970) 3 Cal.3d 553, 559, 91 Cal.Rptr. 153, 476 P.2d 825, an accident is an "unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause." Because the word "accident," as defined by our Supreme Court as well as under the Voorhees analysis, includes *713 unintended consequences from the insured's careless actions, we are not prepared to hold the allegations in the Adams complaint foreclose a finding of "accidental" conduct as a matter of law.

II. THE PROFESSIONAL SERVICES EXCLUSIONS IN THE FIREMAN'S FUND AND COMMERCIAL UNDERWRITERS POLICIES PRECLUDE A DUTY TO DEFEND THE ADAMS ACTION.

Even though we find the existence of a "trigger" for the duty to defend, we still must reverse Judge Gardner's orders as to Fireman's Fund and Commercial Underwriters because we find coverage, and thus the duty to defend, is precluded by the "business" exclusions in defendants' policies.[14] As Gulf conceded at oral argument, the gravamen of Adams's complaint is the harm resulting from Siegel's undertaking to provide services to Adams, for money. Commercial Underwriters' policy excludes "damage arising out of the rendering of or failure to render professional services by the insured" and damage arising out of "business pursuits" of the insured. Fireman's Fund's policy excludes coverage for any damages arising out of any "error, omission, defect or deficiency" for "consultation or advice given by the insured. Royal's policy, on the other hand, only excludes coverage for bodily injury to "an employee of the insured arising out of and in the course of employment by the insured."
We find the first two exclusions preclude coverage. Adams alleged her relationship with Siegel was that of a "consumer," and all the events alleged in the complaint took place in the context of Siegel's business pursuits and Adams's involvement therein. The business relationship among Siegel, Adams, EST, and The Conversation (whereby Siegel was the teacher/therapist and Adams was the "consumer") permeates all the allegations in the Adams complaint, and we cannot reasonably find any potential liability based on any actions outside such relationship. Therefore, we find these exclusions preclude a duty to defend by Commercial Underwriters or Fireman's Fund, and we reverse the summary adjudication in favor of Gulf as to those defendants. For the same reason, we reverse Judge Gardner's order denying Commercial Underwriters' initial motion for summary judgment.

III. BECAUSE FIREMAN'S FUND'S MOTION FOR SUMMARY JUDGMENT CONSTITUTED AN IMPROPER REQUEST FOR RECONSIDERATION OF JUDGE GARDNER'S ORDERS, JUDGE BAKER HAD NO JURISDICTION TO GRANT THE MOTION.

Fireman's Fund argues if we vacate Judge Gardner's orders, the question whether Judge Baker could properly consider its motion for summary judgment becomes moot, and we may ignore the procedural aspects of the matter and leave Judge Baker's orders in place. Alas, it is not so simple. Code of Civil Procedure section 1008 imposes a jurisdictional limitation.[15] If Judge Baker did not have *714 jurisdiction to grant Fireman's Fund's motion for summary judgment, her order is void even if it was correct on the merits.[16]
In her tentative ruling dated February 9, 2000, Judge Baker asked the following questions: "Does this court have the jurisdiction to even consider Fireman's Motion now when it appears that Judge Gardner previously ruled that all insurers, including Fireman's had a duty to defend? [¶] [I]sn't Fireman's instant Motion, as well as summary judgment in favor of Fireman's improper?" In its supplemental brief on this issue, as well as its petition in this action, Fireman's Fund emphasized the incomplete nature of Judge Gardner's order, and contended Gulfs motion for summary adjudication and Fireman's Fund's motion for summary judgment were "two different motions." It further argued under Liberty Mutual, supra, 58 Cal.App.4th 617, 68 Cal.Rptr.2d 219, an insurer may contest its duty to defend at any time, even after an adverse summary adjudication ruling, without presenting new facts, circumstances, or law. Judge Baker, who apparently was not in possession of the complete record of the proceedings before Judge Gardner, agreed with Fireman's Fund and granted its motion for summary judgment, finding it was not an impermissible motion for reconsideration for the reasons set forth in Fireman's Fund's supplemental brief.
We disagree with Fireman's Fund's and Judge Baker's analysis, and find Fireman's Fund's motion for summary judgment was indeed an improper motion for reconsideration of Judge Gardner's ruling on Gulfs motion for summary adjudication. We therefore reluctantly vacate Judge Baker's order, without prejudice to any defendant insurer bringing a new motion for summary judgment.[17]

A. Because the Issues and Arguments Were Identical to Those Raised in Connection with Gulfs Motion, Fireman's Fund's Motion Was, In Effect, a Motion for Reconsideration.

Although Fireman's Fund argues the issues decided by Judge Gardner are narrower than those decided by Judge Baker, our review of the record in the proceedings before both judges reveals the parties presented the same evidence and arguments *715 with respect to Gulfs motion for summary adjudication and Fireman's Fund's motion for summary judgment. Contrary to Fireman's Fund's representation to Judge Baker in its supplemental brief, Gulfs motion did not omit the issue of the application of any exclusions, but sought a ruling as to the overall issue of the existence of a duty to defend. Fireman's Fund raised and thoroughly discussed the policy exclusions in its opposition to Gulfs motion. The fact Judge Gardner's order did not address those issues does not mean they were not part of the motion, and does not mean the motion before Judge Baker was "different."
Both Gulfs motion and Fireman's Fund's motion sought a judicial determination of the same issue: whether Fireman's Fund had a duty to defend Siegel in the Adams action. The points and authorities filed in connection with both motions were virtually identical, raising the same arguments and pointing to the same evidence. Where two motions both implicate the same facts and law but seek opposite outcomes, the second motion necessarily constitutes a motion for reconsideration of the order on the first motion. (Curtin v. Koskey (1991) 231 Cal.App.3d 873, 877, 282 Cal.Rptr. 706 [motion to dismiss for failure to prosecute implicated same considerations as motion for preferential trial setting, thus constituting motion to reconsider ruling on motion for preferential trial setting].)
Having established Fireman's Fund's motion constituted a request to reconsider Judge Gardner's order on Gulfs motion, we find it failed to comply with the requirements of Code of Civil Procedure section 1008. Fireman's Fund did not even attempt to show any "new or different facts, circumstances or law" to permit reconsideration of Judge Gardner's previous order(s).[18] Thus Judge Baker was without jurisdiction to entertain Fireman's Fund's motion.

B. The Liberty Mutual Case Does Not Support Fireman's Fund's Position.

Perhaps recognizing the futility of its argument regarding section 1008, Fireman's Fund argues under Liberty Mutual, supra, 58 Cal.App.4th 617, 68 Cal.Rptr.2d 219, an insurance carrier may bring a summary adjudication motion on its duty to defend at any time, even after the issue has been adjudicated against it, without any showing of new or different facts or law. We do not read Liberty Mutual to support such a broad proposition. In Liberty Mutual, unlike this case, the two motions were based on different facts and law regarding the duty to defend. Liberty Mutual's opposition to the earlier motion was based on an argument about the trigger of coverage. The second motion did not ask for reconsideration on that issue, but argued New York law applied and there was no duty to indemnify under New *716 York law. (Id. at p. 623, 68 Cal.Rptr.2d 219.) The Court of Appeal permitted the second motion to be heard on its merits, because "since the substantive law of insurance provides that a duty to defend endures only so long as a possibility of duty to indemnify remains alive, the trial court must evaluate duty to defend based upon the showing before the trial court at the time of a particular motion. A subsequent motion by an insurer might theoretically constitute an impermissible motion for reconsideration, but only if the factual scenario presented by the insurer in support of the motion were precisely the same as that presented on the earlier motion. Only then would the insurer be asking the court to reconsider an earlier ruling." (Id. at p. 623, 68 Cal.Rptr.2d 219.) This case presents the "impermissible motion for reconsideration" hypothesized by the court in Liberty Mutual.
As Gulf points out, a footnote immediately after the quoted portion of the Liberty Mutual opinion casts doubt upon this reasoning: "Even in this circumstance, there is some doubt about whether section 1008 would bar consideration of the motion. If it were demonstrated to a court that an earlier ruling was erroneous, it is doubtful that the Legislature could nevertheless require continued litigation on the basis of the prior erroneous ruling. This issue is not presently before us and we comment on it only to avoid any appearance of implied ruling." (Liberty Mutual, supra, 58 Cal.App.4th 617, 623 n. 3, 68 Cal.Rptr.2d 219.) This issue is, of course, precisely what is before us, and we disagree with the Liberty Mutual court's doubts. In our view, the jurisdictional provisions of section 1008 apply to all motions for reconsideration. Indeed, the specter of "continued litigation on the basis of the prior erroneous ruling" is present in every case where a trial court denies a potentially dispositive motion. Nevertheless, the Legislature has decided reconsideration is available only in conformity with the provisions of section 1008.
An insurer who wishes to obtain review of a trial court ruling on a duty to defend may, of course, do what the parties have done in this case, and seek writ relief from the Court of Appeal. (Travelers Casualty & Surety Co. v. Superior Court (1998) 63 Cal.App.4th 1440, 1450, 75 Cal.Rptr.2d 54 [issuance of a writ is appropriate to review issues of first impression or in order to prevent a trial of non-actionable claims]; Code Civ. Proa, § 437c(l) [an order granting summary adjudication is reviewable by petition for writ of mandate].) Therefore to the extent Liberty Mutual holds an insurer can bring a motion for summary judgment on its duty to defend, without any new facts or law, after the duty has been summarily adjudicated in the insured's favor, we believe it is incorrect and contrary to sections 1008 and 437c(f)(2).[19]

C. One Trial Judge May Not Reconsider and Overrule the Ruling of Another Judge.

In addition to violating section 1008, Fireman's Fund's motion runs afoul of the well-established principle "one trial court judge may not reconsider and overrule a ruling of another judge." (Curtin v. Koskey, supra, 231 Cal.App.3d 873, 876-877, 282 Cal.Rptr. 706; Ziller Electronics Lab v. Superior Court (1988) 206 Cal. App.3d 1222, 1232, 254 Cal.Rptr. 410.) While there is an exception to this rule when the judge that made the prior ruling is unavailable (Ziller, supra, 206 Cal. App.3d 1222, 1232, 254 Cal.Rptr. 410), in this case Fireman's Fund has not made an adequate showing Judge Gardner was unavailable. While Fireman's Fund argues it *717 should not be required to "track down" Judge Gardner as opposed to having the motion heard before the same court, the fact of the matter is it did not even have its motion heard in the same court. Fireman's Fund asserts "Department T ceased to exist, [and the] motion was transferred to Department BH." In our view, this is insufficient to establish Judge Gardner's "unavailability." Moreover, only by a very large stretch of the imagination can we consider Department BH in Beverly Hills as "the same court" as Department T in Santa Monica. This is yet another reason we must vacate Judge Baker's order.
We are aware our ruling on this issue does not promote judicial economy as we would like. However, even though Judge Baker reached the correct result, because she was without jurisdiction to rule on the matters before her we must vacate her order, without prejudice to the right of Fireman's Fund and Commercial Underwriters to bring motions for summary judgment.

DISPOSITION
Let a writ of mandate issue, directing respondent court to:
1. Vacate Judge Gardner's December 10, 1999 order denying Commercial Underwriters' motion for summary judgment, and issue a new and different order granting said motion;
2. Vacate Judge Gardner's January 28, 2000 order granting Gulfs motion for summary adjudication as to Fireman's Fund and Commercial Underwriters only, and issue a new and different order denying said motion as to those defendants only; and
3. Vacate Judge Baker's February 14, 2000 order, without prejudice to the rights of defendants Fireman's Fund and Commercial Underwriters to bring motions for summary judgment or summary adjudication on the "duty to defend" issue.
The petition challenging Judge Gardner's order granting Gulfs motion for summary adjudication as to Royal Insurance Company is denied.
All parties to bear their own costs in these writ proceedings.
LILLIE, P.J., concur.
WOODS, J., Dissenting:
The majority, dissatisfied by the law as it has developed in California, looks to the law of New Jersey to support its surprising conclusion that the intentional acts here complained of can be considered "accidental" and potentially deserving of insurance coverage, so long as the resulting injury was unintended.
The California Insurance Code prohibits coverage for intentional acts. The prohibition does not require the consequences of such acts to be intended as well. (Ins. Code, § 533.) For this reason, our courts over the last decade have squarely and repeatedly rejected the very law the majority here adopts. (See, e.g. Merced Mutual Insurance Co. v. Mendez (1989) 213 Cal.App.3d 41, 48, 261 Cal.Rptr. 273 [no potential for coverage where the insured intended the sexual acts complained of, even though the insured may have reasonably believed the acts were consensual and thus did not intend to cause the injury]; Quun v. Truck Insurance Exchange (1998) 67 Cal.App.4th 583, 598, 79 Cal. Rptr.2d 134 [the acts complained of, including kissing claimant against her will was deliberate, regardless of whether the insured intended any injury to come of it, and therefore, there can be no potential for coverage].)
As the majority concedes, the acts set forth in the complaint, including the use of the insured's position of trust with the plaintiff to extract sexual and monetary favors from her, were intentional. Based on the aforementioned statute and case law, I find no potential for coverage in this instance. Accordingly, I respectfully dissent.
NOTES
[*] Commercial Underwriters Insurance Company v. Superior Court (No. B139117); Fireman's Fund Insurance Company v. Superior Court (No. B139229); Royal Insurance Company of America v. Superior Court (No. B139339); Gulf Underwriters Insurance Company v. Superior Court (No. B139637).
[**] The Supreme Court ordered that the opinion be not officially published. (See California Rules of Court Rules 976 and 977.)
[1] Adams's lawsuit also named The Conversation as a defendant. Except as otherwise indicated, we refer to defendants collectively as "Siegel."
[2] According to Gulf's complaint, Gulf issued a Specialty Errors and Omissions Liability policy for the period July 21, 1995 to July 21, 1996; Royal issued general liability policies for the period April 18, 1998 to April 18, 1994; Fireman's Fund issued primary homeowners and general liability policies for the period November 9, 1990 to November 9, 1991 and June 14, 1994 to June 14, 1996. Continental issued a primary commercial genera] liability policy for the period April 18, 1994 to June 15, 1994; and Commercial Underwriters issued a personal excess liability policy for the period November 8, 1993 to November 8, 1994. The defense of Adams's lawsuit was tendered to Gulf, Royal, Fireman's Fund, and Continental on April 9, 1996.
[3] The order stated "`Bodily Injury' means `bodily injury, sickness or disease sustained by a person ...' according to policies by Royal and Fireman's Fund.... Continental's policy says the same, and also includes mental anguish.... Commercial has all of the above, plus `shock.'" This appears to be a correct statement of the policy terms.
[4] Neither Royal nor Continental joined in Fireman's Fund's motion.
[5] The New Jersey Supreme Court in Voorhees noted this result is in conformity with "[a] significant number of courts [which] have held that when emotional distress results in physical manifestations, it is covered under a bodily-injury policy." (Voorhees, supra, 128 N.J. 165, 176-177, 607 A.2d 1255.) It also quoted Aim Insurance, supra, 229 Cal.App.3d 209, 280 Cal.Rptr. 766, as a decision from one of "a number of jurisdictions denying coverage for emotional distress [which] have noted that if plaintiff had alleged physical symptoms, the duty to defend would have been triggered." (Voorhees. supra, 128 N.J. 165, 177, 607 A.2d 1255.)
[6] There are small and, for our purposes, insignificant differences in the pertinent language in the various defendant insurers' policies. Royal and the Fireman's Fund general liability policy define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Fireman's Fund's homeowners policy defines it as "an accident, including continuous or repealed exposure to similar harmful conditions." Commercial Underwriters defines it as "an accident or accidental event, including continuous or repeated exposure to conditions...."
[7] See Coit Drapery Cleaners, Inc. v. Sequoia Insurance Co. (1993) 14 Cal.App.4th 1595, 1606, 18 Cal.Rptr.2d 692 ("We emphasize that we are dealing here with a case in which the acts of sexual harassment alleged are, by their very nature, intentional and wrongful," therefore no duty to defend.).
[8] The Mendez court attempted to illustrate its intentional/unintentional acts distinction through the following example: "When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be an intentional act. However, the act directly responsible for the injuryhitting the other carwas not intended by the driver and was fortuitous. Accordingly, the occurrence resulting in injury would be deemed an accident. On the other hand, where the driver was speeding and deliberately hit the other car, the act directly responsible for the injuryhitting the other carwould be intentional and any resulting injury would be directly caused by the driver's intentional act." (Mendez, supra, 213 Cal.App.3d 41, 50, 261 Cal. Rptr. 273.) We are not persuaded by this analogy. In our view, the Mendez court's illustration demonstrates the ultimate lack of utility in its analysis. The speeding car's collision with the other car was not an "unintentional act" at all, but was rather the unintended consequence of the driver's intentional but negligent (or careless) act of speeding. Surely, it is splitting metaphysical hairs to deny the reality, as a practical matter, the driver's speeding was (in any generally accepted sense) "the act directly responsible for the injury." The collision would nevertheless be "accidental" under our interpretation of a CGL policy, however, because it represents the unintended consequences of the driver's intentional yet careless conduct.
[9] Interestingly enough, the court in Capitol Indemnity cited Merced, supra, 213 Cal. App.3d 41, 50, 261 Cal.Rptr. 273, in support of its ruling, quoting this passage: "an accident exists when any aspect in the causal series of events leading to the injury or the damage was unintended by the insured and a matter of fortuity." (Capitol Indemnity, supra. 51 F.Supp.2d 1080, 1085.) However, it went on to disagree with cases stating the "intent" rule, stating "Capitol Indemnity's reliance on non-Nevada authorities such as Capitol Indem. Corp. v. L. Carter Post 4472 Veterans of Foreign Wars, Inc., 225 Ga.App. 354, 484 S.E.2d 52, 54 (1997) and Britamco Underwriters, Inc. v. Grzeskiewicz, 433 Pa.Super. 55, 639 A.2d 1208, 1210-11 (1994) is misplaced, insofar as these cases improperly focus on whether the tortfeasor intended to commit the injury-causing act." (Id. at p. 1085.) We think this highlights the conceptual murkiness of the Mendez court's approach.
[10] Defendants rely on Ray v. Valley Forge Insurance Company (1999) 77 Cal.App.4th 1039, 1048, 92 Cal.Rptr.2d 473 for the proposition CGL policies do not cover damages due to errors and omissions in giving professional advice. However, the long, "multi-faceted" relationship alleged between Adams and Siegel is not reasonably comparable to a one-time rendering of bad advice regarding roofing material. Moreover, because we reject the Mendez analysis, absent a "business pursuits" or similar exclusion we would have been inclined to find a duty to defend in Ray based on the possibility the advice in question was given in a moment of carelessness that resulted in unexpected and unintended consequences.
[11] While Horace Mann dealt with an educator's liability policy rather than a CGL policy as in this case (Horace Mann, supra, 4 Cal.4th 1076, 1080, 17 Cal.Rptr.2d 210, 846 P.2d 792), it does illustrate the fact the existence of a sexual relationship, even an improper one, between the insured and the complainant does not necessarily act as a per se bar to coverage or the duty to defend.
[12] We are aware, of course, of recent authority from our Supreme Court affirming a distinction between "accidental means" and "accidental results" in the context of cases seeking coverage under policies insuring against "death by accidental means." (See, e.g., Weil v. Federal Kemper Life Assurance Co. (1994) 7 Cal.4th 125, 27 Cal.Rptr.2d 316, 866 P.2d 774.) This distinction runs counter to the majority of jurisdictions. (Id. at p. 138, 27 Cal.Rptr.2d 316, 866 P.2d 774 ["as of 1992, 22 jurisdictions, including California, expressly recognized the distinction between `accidental means' and `accidental death' [citations], whereas 25 jurisdictions expressly have rejected or repudiated this distinction. [Citation.]"].) More to the point, this analysis does not apply to CGL policies such as those before us in this case. Indeed, because CGL policies do not include the phrase "accidental means," cases such as Weil, supra, support the use of the more straightforward "intent to do harm" analysis we adopt in this case, rather than the narrower "intent to do the act" analysis used in Mendez and its progeny. (See Hargreaves v. Metropolitan Life Ins. Co. (1980) 104 Cal.App.3d 701, 705, 163 Cal. Rptr. 857 ["Where, as here, the policy does not insure against accidental death or accidental injuries, but against death or injuries caused by accidental means, it is not sufficient that the death or injury should be unexpected, but in the means through which the injury was sustained or the death produced there must be something of an unexpected or unforeseen character."].) In effect, Mendez improperly read an "accidental means" requirement into a policy that required only an "accident."
[13] As noted by the court in Voorhees, the court in Mendez, supra, 213 Cal.App.3d 41, 50, 261 Cal.Rptr. 273, acknowledged "an `accident' exists when any aspect in the causal series of events leading to the injury or damage was unintended by the insured and a matter of fortuity."
[14] Royal's policy does not include a "professional services" or "business pursuits" exclusion. It does contain an exclusion for "bodily injury" to an employee of the insured arising out of and in the course of employment by the insured. The Adams complaint does allege Adams was an employee of Siegel and/or The Conversation, but the face of the complaint does not definitively establish Adams was an employee during the entire period in which Siegel's wrongful conduct allegedly took place. Moreover, Adams's allegations include but go beyond her work as Siegel's employee, with the primary focus on her role as Siegel's "consumer," who paid for his services. Because there exist allegations falling outside the employment exclusion, we find the exclusion in Royal's policy does not defeat Royal's duty to defend.
[15] Code of Civil Procedure section 1008 provides in pertinent part as follows: "(a) When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown. [¶] ... [¶] (e) This section specifies the court's jurisdiction with regard to applications for reconsideration of its orders and renewals of previous motions, and applies to all applications to reconsider any order of a judge or court, or for the renewal of a previous motion, whether the order deciding the previous matter or motion is interim or final. No application to reconsider any order or for the renewal of a previous motion may be considered by any judge or court unless made according to this section."
[16] Because we reverse Judge Gardner's order denying Commercial Underwriters' first motion for summary judgment and direct the entry of an order granting summary judgment in favor of Commercial Underwriters, Judge Baker's ruling is moot as to Commercial Underwriters. We note, however, our discussion of the propriety of her ruling on Fireman's Fund's motion for summary judgment would apply with even greater force to Commercial Underwriters' joinder.
[17] Fireman's Fund urges us to discount the violation of section 1008 as "harmless error," citing article VI, section 13 of the California Constitution and Code of Civil Procedure section 475. We decline to adopt Fireman's Fund's construction of these authorities, because to do so would effectively eliminate the jurisdictional component of section 1008, subdivision (e). When a court acts without jurisdiction, it is not a mere error in "pleading or procedure." Rather it is an entirely void act which may not be affirmed even if, as in this case, it is correct on the merits.
[18] We realize this dilemma was not entirely of Fireman's Fund's making. It filed its motion before Judge Gardner ruled on Gulf's motion for summary adjudication, in the face of a fast-approaching trial date. Certainly if Gulf's motion had been denied, there would have been no impediment to Fireman's Fund proceeding with its motion in order to obtain final judgment in its favor. However, once Gulf's motion was granted, Fireman's Fund's duty to defend had been established and its own motion for summary judgment should have been taken off calendar or supplemented with whatever "new facts, circumstances or law" were available to bring it into compliance with Code of Civil Procedure section 1008. If no grounds existed for reconsideration (as is apparently the case), Fireman's Fund was free to bring a writ proceeding in this court. In its answer to Gulf's petition, Fireman's Fund asks (somewhat rhetorically) whether, if Fireman's Fund's motion been heard first, Gulf's motion would have been an impermissible motion for reconsideration. Given the identity of the issues in the two motions, we answer in the affirmative (assuming the court granted Fireman's Fund's motion). While this seems incongruous, it would have been easily avoidable: the trial court should have scheduled the hearings on all motions seeking to determine the defendants' duty to defend for the same day, and dealt with them together rather than separately.
[19] Code of Civil Procedure section 437c, subdivision (f)(2), provides in pertinent part a "party may not move for summary judgment based on issues asserted in a prior motion for summary adjudication and denied by the court, unless that party establishes to the satisfaction of the court, newly discovered facts or circumstances or a change of law supporting the issues reasserted in the summary judgment motion."